# EXHIBIT 2

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| **A.F.,** | ) |
| **Plaintiff,** | ) |
| v. | ) Case No.: 2:23-cv-01241 |
| **ASSOCIATION OF AMERICAN MEDICAL COLLEGES,** | ) |
| **Defendant.** | ) |

**DECLARATION OF JOSEPH E. BERNIER, PH.D.**

I, Joseph E. Bernier, declare as follows:

1. My name is Joseph E. Bernier and, unless otherwise stated, this declaration is based on my personal knowledge.

2. I am a licensed psychologist in New York State. I have a professional practice that provides psychological evaluations to individuals and disability-related consulting services to organizations, including professional licensing and trade certification boards, and other standardized testing entities. I have been in professional practice since 1978 and have conducted hundreds of psychological evaluations over the course of my career. A true copy of my curriculum vitae is attached as Exhibit A.

3. In March 2023, I was asked by the Association of American Medical Colleges (AAMC) to review documentation relating to a prospective examinee's request that she be reconsidered for 50% extended test time on the Medical College Admissions Test (MCAT). The examinee is referred to here as "A.F.," which is how I understand she is currently identified in the above-

1

referenced lawsuit. A true copy of the report that I provided to AAMC in response to this request, dated March 8, 2023, is attached as Exhibit B.

4. The AAMC had approved A.F. for sixty minutes of stop-the-clock breaks to be taken as needed during the test, but had denied her request for 50% additional testing time. A.F. subsequently asked for reconsideration of her request for for 50% additional test time.

5. In general, when I review a request for accommodations on the MCAT or on another standardized test, I focus on evaluating the documentation of functional limitations associated with the diagnosed impairment and consider in the first instance whether any such limitations rise to a level of substantial limitation in a major life activity when the candidate's performance is compared to most people in the general population. If I find sufficient evidence of such substantial limitation, I next consider whether the requested accommodation is warranted based on the nature and extent of the individual's functional limitations.

6. In this instance, AAMC had previously approved A.F. for additional break time. Therefore, as a practical matter, there was no need for me to consider the threshold question of whether A.F. is substantially limited as compared to most people in the general population by her diagnosed impairments, so as to warrant any accommodation. AAMC had already decided to approve an accommodation. My focus was instead on whether A.F.'s documentation demonstrated that she needed 50% additional time in order to take the MCAT in an accessible manner.

7. After reviewing of all the documents submitted in support of A.F.'s accommodation request, I concluded that the documentation did not support her need for extended test time. In coming to this conclusion, I carefully considered the recommendations of her clinical providers and whether their explanations for why extra time was necessary was supported by pertinent medical findings and other relevant information reflected in the documentation.

2

8. One of A.F.'s professionals, Dr. Benninger, argued for extended test time and a distraction-free room. He stated that extra test time "*will compensate for the working memory and inattentive symptoms documented in the testing and will compensate for the extra time a student needs due to their difficulty with sustaining attention with a mentally demanding task and therefore taking longer for those tasks. It will also help to compensate for having to reread questions and answers multiple times due to working memory deficit*". He explained that a quiet room "*will compensate for the student's difficulty with staying on task and being easily distracted by extraneous stimuli*".

9. As discussed in my review, these recommendations were not supported by the objective findings from the clinical examination that Dr. Benninger had apparently done, or by A.F.'s history of taking other standardized tests.

10. Dr. Benninger stated that additional test time "*will compensate for the working memory and inattentive symptoms*". He objectively evaluated memory using two subtests: digit recall from the Wechsler Adult Intelligence Scale-V and the memory for sentences subtest from the Stanford-Binet Intelligence Scale-IV. However, A.F.'s scores on these brief and limited assessments of working memory were within one standard deviation of the mean -- *i.e.*, average compared to others of the same age. The standard scores for both these subtests were at the 25th percentile, and therefore in the average range. Dr. Benninger also enlisted the passage comprehension subtest from the Gray Oral Reading Test-5 as a measure of complex memory. To the best of my knowledge, this particular measure has not been validated as a memory test. Regardless, A.F. scored at the 25th percentile -- again, average compared to others at her age. None of these tests used by Dr. Benninger to evaluate memory reflect that A.F. is normatively impaired. It appears that Dr. Benninger's determination of impaired functioning was based on the internal

3

referent of the candidate herself rather than the external referent of the general population. He inappropriately treats the presence of strengths and weaknesses in A.F.'s short cognitive test profile as if they are normative impairments. They are not.

11. As discussed in my review, Dr. Benninger also administered certain reading tests, specifically passage comprehension from the Woodcock Johnson-IV and the Gray Oral Reading Test-5 (GORT-5). A.F.'s passage comprehension score on the Woodcock was average, as was her passage comprehension on the GORT-5 oral reading test. Also, the demands of the GORT-5 oral reading comprehension subtest are very different than the reading that is required on a written examination like the MCAT, where the examinee can refer back to the text (which is not the case with the GORT-5 measure). That said, A.F.'s oral reading comprehension test score (regardless of any demands the GORT-5 may place on working memory) was within the average range.

12. Dr. Benninger did not include any objective measures of complex cognitive processing, reasoning, sustained attention, or executive functioning as are relevant for performing complex cognitive tasks. Nor did he use a continuous performance test as part of his assessment battery to objectively document impaired attentional processes and mental control.

13. As detailed in my review, it is also appropriate to consider A.F.'s performance on standardized admissions tests in the past, as those tests provide real-world instances in which A.F. would have needed to exercise the skills and abilities called for when taking the MCAT, in settings where she would have had every incentive to perform at her best. To my knowledge, there is no history of A.F. being substantially limited in her ability to perform the cognitive functions relevant to accessing a standardized, written examination like the MCAT. A.F. apparently took both the ACT and SAT college admissions tests, but she provided only her ACT scores to AAMC and those are the only scores I have reviewed. She took the ACT twice, both times in her junior year of high

4

school.  Compared to other college-bound students, her scores on the various subtests were mostly *above* average, but in all instances they were at least average. The percentile scores are indicated below, based on published ACT data applicable to that approximate testing year (2018), found at www.act.org/content/dam/act/unsecured/documents/MultipleChoiceStemComposite2017-18.pdf:

|          | Composite | Math | Science | English | Reading |
|----------|-----------|------|---------|---------|---------|
| Apr 2018 | 94th      | 98th | 95th    | 99th    | 60th    |
| Feb 2018 | 89th      | 99th | 82nd    | 94th    | 54th    |

Statistically speaking, the average range encompass scores that are within the middle sixty-eight percent of a particular population, meaning scores between the 16th and 84th percentiles. Seven of the ten scores that A.F. achieved on this standardized, time-limited admissions examination were above average compared to college-bound students, and no score was outside and below the average range. These results are inconsistent with Dr. Benninger stating that A.F. needs extra time due to her "*difficulty with sustaining attention with a mentally demanding task*".  A.F.'s test scores on the ACT would instead support the conclusion that her attention and cognitive functioning is not limited in any substantial way.

      14.   According to other documentation submitted by A.F., she is being treated by a physicians' assistant, Pamela Campbell MSPAS, PA-C, who recommended 100% additional test time. No objective information was offered by Ms. Campbell to explain why extra time is needed by A.F. when she takes the MCAT, much less 100% extra time.

      15.   As discussed in my review, I found no objective evidence to substantiate that A.F. has been an impaired learner as compared to the general population. Her academic transcripts through college indicated that she performed extremely well whether or not she received accommodations. The records show that she was approved for college accommodations in April 2021, specifically 50% additional test time and breaks without penalty.  Nevertheless, the school records from high

5

school and college, prior to April 2021, indicate consistently exceptional grades that were well above those of her classmates, with no accommodations. This is a level of performance that is foreign to most people and clearly does not reflect substantial limitations.

16. In conclusion, A.F. requested 50% additional testing time when she takes the Medical College Admissions Test. In response to her initial request, AAMC approved additional break time in the form of stop-the-clock breaks during the exam to manage her reported symptoms. It is my understanding that AAMC has also approved testing in a separate room, based upon Dr. Benninger's recommendation that such a testing environment would help address A.F.'s alleged concentration issues. Dr. Benninger did not effectively support his explanation for why extra test time is needed with objective evidence found in his assessments, nor did he point to any historical evidence from other standardized examinations whose task demands are similar to those of the MCAT. The same is true of the letters from Ms. Campbell. She did not provide any objective evidence to support her recommendation. In my opinion, the documentation submitted to AAMC by or on behalf of A.F. does not substantiate a need for additional testing time in order for A.F. to take the MCAT in an accessible manner.

I declare under penalty of perjury that the foregoing is true and correct, this 12th day of April, 2022:

                                                Joseph E. Bernier, Ph.D.
                                                _____
                                                Joseph E. Bernier, Ph.D.
                                                Licensed Psychologist

# **Exhibit A**

# Joseph E. Bernier, Ph.D.
Curriculum Vita
Abbreviated

### Current Professional Activity

Consulting and clinical psychology (1978-present).

(Provide disability-related consulting services to organizations and diagnostic psychological evaluations to individuals. Established client organizations include professional licensing and trade certification boards, and other standardized testing entities.)

### Education

Highest Degree Earned:  Ph.D.              Date of Degree:  August 1976

Institution/Program Name: University of Minnesota/Educational Psychology

Area of Degree: Counseling Psychology          APA Accredited:  Yes

Psychology Internship Completed:  Yes          Year: 1975-1976

### Psychology Licensure and Certification

Psychology Licensure: Yes      State:  New York          Year: 1978 - present

*National Register of Health Service Psychologists*: Yes          Year: 1983 – present

### Professional Memberships

Member, American Psychological Association

### Selected Publications

Flanagan, D., Keiser, S., Bernier, Joseph E., and Ortiz, S. Diagnosis of Learning Disability in Adulthood, Boston, Allyn and Bacon (2003).

Rivero, E. M., Cimini, M. D., Bernier, J. E., Stanley, J. A., Murray, A. D., Anderson, D. A., & Wright, H. R. (2014). Implementing an early intervention program for residential students who present with suicide risk: a case study. Journal of American College Health, 62(4), 285-291.

Cimini, M. D., Rivero, E. M., Bernier, J. E., Stanley, J. A., Murray, A. D., Anderson, D. A., Wright, H.W., & Bapat, M. (2014). Implementing an audience-specific small-group gatekeeper training

1

program to respond to suicide risk among college students: A case study. <u>Journal of American College Health</u>, 62(2), 92-100.

## Past Primary Professional Employment

(1) Psychologist and Director for Doctoral Internship Training & Clinical Assessment, Counseling and Psychological Services/University at Albany, 400 Patroon Creek Blvd., Suite 104, Albany, New York 12206 (tenured) (1991-2018)

(2) Instructor, Department of Counseling Psychology, University at Albany, Albany, NY (2001, 2007, 2008)

(3) Psychologist, Four Winds Hospital, Saratoga Springs, New York (1988-1991)

(4) Psychologist & Director, Psychological Counseling Center, Siena College, Loudonville, New York (1987-1988).

(5) Psychologist & Director, Psychological Counseling Service, the College of St. Rose, Albany, New York (1980-1987)

(6) Assistant Professor, Department of Counseling Psychology and Student Development, State University of New York at Albany, Albany, New York (1976-1980)

## References

References furnished upon request.

# **<u>Exhibit B</u>**

# Joseph E. Bernier, Ph.D.
Consulting and Clinical Psychology
Licensed Psychologist

josephebernier@gmail.com
(518-573-5964)

**CONFIDENTIAL**
March 18, 2023

Kathryn Bugbee, PhD
Director, MCT Accommodation Services
Association of American Medical Colleges
655 K Street, NW
Washington, DC 20001-2399

Re:     A.F.

Dear Dr. Bugbee,

This examinee has requested that she be reconsidered for 50% extended test time and a separate room for the *Medical College Admissions Test*. I have been asked to review her request.

My review is based on the *MCAT* accommodations request form and personal statements; a letter from her attorney, David Goldstein, dated March 4, 2023; a 2023 psychological evaluation performed by William Benninger, PhD and an addendum to the evaluation, the last dated March 2023; letters from a treating physician's assistant, Pamela Campbell, dated November 14, 2022 and December 23, 2022; ACT score reports for February 2018 and April 2018 examinations; verification of college accommodations in 2021 and 2022; college transcript 2019-2022; and private high school transcript 2015-2018.

Based on the information available it appears that *American Association of Medical Colleges* has approved the examinee for sixty minutes of stop-the-clock breaks to be taken as needed. She has asked that they reconsider their denial of her earlier request for 50% additional time to answer test items and a separate room. Upon review, in my opinion the documentation that she provided does not sufficiently support her need for extended testing time.

The examinee submitted a letter from her attorney and an addendum to a psychological evaluation to support her current request. These two documents provide no new facts. Her attorney states that the *determining* factor is what her doctors recommend. The psychologist articulates a rationale for granting her time and one-half and a separate room. Again, neither provide any new facts.

There is no evidence that the candidate has been an impaired learner as compared to the general population. The transcripts show that despite her difficulties she was a straight-A student in high

1

school without a formal accommodations plan. Her cumulative grade point average in college was 4.0 before she was approved for accommodations -time and one-half for course examinations and rest breaks without penalty. She continued to be an outstanding student with these accommodations. The academic documents suggest that although she may have had to work harder than many of her peers to achieve the level of success reflected in the record, her mental disorders did not put her at a significant disadvantage as compared to the general public.

The standardized testing records do not indicate impaired access to test content because of any cognitive processing difficulties. I am referring to the examinee's performances on the *ACT* college admissions examination -an examination that compared her to other college-bound students, not to the general population. Given her diagnoses it is reasonable to assume that she was symptomatic at the time she took the examinations. She received no accommodations, and despite her impairments her composite scores were above average -in fact in the top 12 percent of those taking the examination. The subject area scores were average and above average, and some were in the upper extreme of performance. The *ACT* takes about 2 hours and 55 minutes to complete, excluding breaks. The implication: there is no apparent history of the examinee being substantially limited in her ability to perform the cognitive functions relative to accessing a standardized examination like the *Medical College Admissions Test.*

In his addendum, Dr. Benninger argued for extended test time and a distraction-free room. He noted that the extra test time "*will compensate for the working memory and inattentive symptoms documented in the testing and will compensate for the extra time a student needs due to their difficulty with sustaining attention with a mentally demanding task and therefore taking longer for those tasks. It will also help to compensate for having to reread questions and answers multiple times due to working memory deficit*". He noted that a quiet room "*will compensate for the student's difficulty with staying on task and being easily distracted by extraneous stimuli*".

Dr. Benninger did not conduct a comprehensive assessment of cognitive performance. The cognitive performance testing consisted of the vocabulary and digit recall subtests from the *WAIS-IV*, and the memory for sentences subtest from the *Stanford-Binet-5*. Single subtests generally provide poor construct coverage or measurement, and the interpretations, diagnoses, and predictions based on single subtests is questionable practice. Dr. Benninger used a significant variation between the examinee's extremely high vocabulary score and her average performance on other cognitive measures as the basis for documenting impaired functioning. Variability in test score profiles is commonplace, and areas of relative personal strengths and weakness are to be expected. Dr. Benninger's determination of impaired functioning is based on the internal referent of the candidate herself rather than the external referent of the general population. In truth, performance on the cognitive tests of working memory were within one standard deviation of the mean -average compared to others of the same age. The doctor's description of severe impairment is misleading. This cognitive battery did not adequately measure complex cognitive processing or reasoning and executive functioning to support any claims in this regard. Dr. Benninger also administered reading tests, specifically passage comprehension from the *WJ-IV* and the *Gray Oral Reading Test-5*. Passage comprehension on the *Woodcock* was average, as was passage comprehension on the oral reading test. Dr. Benninger referred to the *GORT* passage comprehension subtest as a marker of working memory. Although this reading subtest is a recognized and accepted measure of comprehension, it is influenced by working memory. Still the

2

examinee scored within the average range on this measure as compared to the general population. It is important to recognize that the demands of the oral reading comprehension test are very different than the reading required on the admissions examination where the examinee is allowed to refer back to the text (which is not the case with the *GORT-5* measure). Ultimately, Dr. Benninger did not effectively support his explanation for why extra time is needed with any objective evidence found in his assessment, nor with historical evidence found on standardized examinations whose task demands are similar to those of the *Medical College Admissions Test*.

In the end, the documentation that has been provided does not support the request for fifty percent additional test time. Sixty minutes of stop the clock breaks as previously approved, and a low distraction test setting appear to be appropriate modifications.

*Joseph E. Bernier, Ph.D.*
Joseph E. Bernier, Ph.D.
Licensed Psychologist