**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **A.F.,** | **:** | |
| | **:** | |
| **Plaintiff,** | **:** | **Case No. 2:23-cv-01241** |
| | **:** | |
| **v.** | **:** | **Judge Edmund A. Sargus** |
| | **:** | |
| **ASSOCIATION OF AMERICAN** | **:** | **Magistrate Judge Elizabeth Preston** |
| **MEDICAL COLLEGES,** | **:** | **Deavers** |
| | **:** | |
| **Defendant.** | **:** | |

---

**DEFENDANT ASSOCIATION OF AMERICAN MEDICAL COLLEGES'**
**OPPOSITION TO PLAINTIFF'S MOTION FOR A TEMPORARY RESTRAINING**
**ORDER AND/OR PRELIMINARY INJUNCTION**

---

Erin D. French (0090813)
VORYS, SATER, SEYMOUR AND PEASE LLP
301 East Fourth Street, Suite 3500
Cincinnati, Ohio 45202
Phone: 513-723-4022
Email: edfrench@vorys.com

Robert A. Burgoyne
(Admitted *pro hac vice*)
PERKINS COIE LLP
700 Thirteenth Street, N.W. Suite 800
Washington, D.C. 20005-3960
Phone: 202-654-1744
Email: RBurgoyne@perkinscoie.com

Counsel for Association of American Medical
Colleges

## <u>TABLE OF CONTENTS & SUMMARY OF ARGUMENT</u>

PRELIMINARY STATEMENT ............................................................................................ 1

BACKGROUND ............................................................................................................... 3

    I.      AAMC and the MCAT ...................................................................................... 3

    II.     Plaintiff's Request for Accommodations on the MCAT ...................................... 4

    III.    Plaintiff's Academic and Standardized Testing History..................................... 10

ARGUMENT....................................................................................................................... 13

    I.      TRO and Preliminary Injunction Standard ....................................................... 13

    II.     Plaintiff Has Not Shown That She Is Likely to Succeed on the Merits.............. 14

Summary

> Plaintiff's position is that she is disabled within the meaning of the ADA and requires extra testing time on the MCAT because two medical professionals diagnosed her with various impairments and said that she needs extra testing time.  She is wrong.  Having a diagnosed impairment does not make someone disabled within the meaning of the ADA. Instead, under the ADA, she must prove that her alleged impairments substantially limit her ability to perform one or more major life activities as compared to most people in the general population.  The diagnostic reports she relies upon show no such substantial limitations.  She asserts that two "doctors" diagnosed her with impairments and opined that she needs extra testing time, but she did provide AAMC and has not provided the Court with any report or opinion from one of those "doctors;" instead, she relies upon a letter from a Physician Assistant in the same practice, which provides no diagnostic information and gives no opinion regarding the extent to which Plaintiff experiences any functional limitations.  Plaintiff has provided the Court with a report from a psychologist containing diagnostic information, but the assessment results in that report reflect average or above average performance abilities in the domains that were evaluated, not substantial limitations in any major life activities.

        A.  Disability Under the ADA:  Substantial Limitation in a Major Life
            Activity Compared to Most People in the General Population..................... 17

Summary

> Having a diagnosed impairment does not equate to being disabled within the meaning of the ADA. In evaluating whether Plaintiff is substantially limited in one or more major life activities, her claimed limitations must be measured against the general population, not against college graduates, other prospective medical students, or her own expectations.

Primary Authorities

    42 U.S.C. § 12189

42 U.S.C. § 12102(1)

28 C.F.R. § 36.105(d)(1)(v)

*Singh v. George Wash. Univ.*, 508 F.3d 1097 (D.C. Cir. 2007)

*Doherty v. Nat'l Bd. of Med. Exam'rs*, 791 F. App'x 462 (5th Cir. 2019)

*Black v. Nat'l Bd. of Med. Exam'rs*, 281 F.Supp.3d 1247 (M.D. Fla. 2017)

*Rumbin v. Ass'n of Am. Med. Colleges*, 803 F. Supp. 2d 83 (D. Conn. 2011)

B.  Plaintiff is Not Disabled Within the Meaning of the ADA ........................... 18

Summary

Plaintiff is not likely to prevail on the merits of her claim, because she is not disabled with the meaning of the ADA.

Primary Authorities

*Wright v. Nat'l Bd. of Med. Exam'rs,* 2021 WL 5028463 (D. Colo. 2021)

*Valles v. ACT,*  2022 WL 2789900 (E.D. Tex. 2022)

*Hentze v. CSX Transp., Inc.,* 477 F. Supp.3d 644 (S.D. Ohio 2020) (Cole, J.)

*Gonzales v. Nat'l Bd. of Med. Exam'rs*, 225 F.3d 620 (6th Cir. 2000)

*Black v. Nat'l Bd. of Med. Exam'rs*, 281 F.Supp.3d 1247 (M.D. Fla. 2017)

*Glueck v. Nat'l Conf. of Bar Exam'rs*, 2018 WL 3977891 (W.D. Tex. 2018)

*Healy v. Nat'l Bd. of Osteopathic Med. Exam'rs*, 870 F.Supp.2d 607 (S.D. Ind. 2012)

*Rumbin v. Ass'n of Am. Med. Colleges*, 803 F. Supp. 2d 83 (D. Conn. 2011)

*Love v. Law Sch. Adm. Council,* 513 F. Supp. 2d 206 (E.D. Pa. 2007)

*Healy v. Nat'l Bd. of Osteopathic Med. Exam'rs*, 870 F.Supp.2d 607, 620 (S.D. Ind. 2012)

*Rawdin v. Am. Bd. of Pediatrics*, 985 F. Supp.2d 636, 651-52 (E.D. Pa. 2013)

*Baer v. Nat'l Bd. of Med. Exam'rs*, 392 F.Supp.2d 42, 46 (D. Mass. 2005)

*Mann v. Louisiana High Sch. Athletic Ass'n.*, 535 Fed. App'x 405, 410 (5th Cir. 2013)

C. Even if Plaintiff Could Show that She is Disabled Under the ADA, She Has Not Shown that the Accommodations Approved by AAMC were Unreasonable ........................................................................................ 24

Summary

Disabled individuals are entitled to reasonable accommodations, not their preferred accommodations. In the testing context, this means accommodations that enable the individual to test in an accessible manner. Even if Plaintiff were disabled, she has not shown that she cannot take the MCAT in an accessible manner using the accommodations AAMC has approved: stop-the-clock breaks and a separate testing room, both of which address her core alleged functional limitations relating her to inattentiveness, without providing an accommodation -- extra testing time -- that has the greatest likelihood of inappropriately affecting the validity of a resulting test score absent a legitimate need for extra testing time.

Primary Authorities

42 U.S.C. § 12189

*Knox County, Tenn. v. M.Q.*, 62 F.4th 978, 1001 (6th Cir. 2023)

III. Plaintiff Has Not Shown a Risk of Irreparable Harm ........................................... 25

Summary

Plaintiff has not shown that she faces a risk of irreparable harm absent interim injunctive relief. Her central alleged risk is that she will be delayed in enrolling in her preferred medical school if she cannot take the MCAT, with extra testing time, on the date she wants to take it (April 28, 2023). This alleged harm, supported by only her own assertions, is entirely speculative. More to the point, ample case law supports the proposition that a delay in getting into a university or graduate school does not constitute irreparable harm.

Primary Authorities

*Garfield v. Middle State Univ.*, 2021 WL 9979155 (M.D. Tenn. 2021)

*Roden v. Floyd*, 2018 WL 6816162 (E.D. Mich. 2018)

*Doe v. Ohio State Univ.*, No. 2:15-cv-2830, 2016 WL 692547 (S.D. Ohio 2016)

*Pierre v. University of Dayton*, 143 F.Supp.3d 703 (S.D. Ohio 2015)

*Oser v. Capital Univ. Law School*, No. 2:09–cv–709, 2009 WL 2913919 (S.D. Ohio 2009)

*Qui v. Univ. of Cincinnati*, No. 1:18-cv-634, 2018 WL 4496304 (S.D. Ohio Sept. 19, 2018)

*Nimmer v. Case Western Reserve Univ.*, 2018 WL 5118306 (N.D. Ohio 2018)

*Bach v. Law Sch. Adm. Council*, 2014 U.S. Dist. LEXIS 124632 (M.D.N.C. 2014)

*Baer v. Nat'l Bd. of Med. Examiners*, 392 F.Supp.2d 42, 49 (D. Mass.2005)

IV.    An Injunction Would Harm Others ....................................................................... 28

Summary

AAMC has a strong interest in ensuring that the MCAT is fairly administered to all examinees, including but not limited to individuals who are disabled within the meaning of the ADA. It also has an interest in protecting the integrity of MCAT scores. The requested injunction would harm these interests, and the harm cannot be undone after scores are reported. Plaintiff wants extra testing time because medical school admissions are competitive. Her success in gaining an admission to a medical school, however, would necessarily come at the expense of other candidates seeking admission to the same schools. That means that her requested injunction would harm not only AAMC, but also other prospective medical school students. In addition, medical schools are harmed if they admit an applicant on the strength of an MCAT score obtained with unwarranted accommodations.

Primary Authorities

*Powell v. Nat'l Bd. of Med. Exam'rs*, 364 F.3d 79, 88-89 (2d Cir. 2004)

*Rothberg v. Law Sch. Adm. Council*, 102 Fed. App'x 122, 125 (10th Cir. 2004)

V.    An Injunction Would Not Serve the Public Interest ............................................... 29

Summary

Plaintiff is not disabled. While the public certainly has an interest in the enforcement of the ADA, the public also has an interest in the fair administration of standardized tests and the reporting of valid scores.

Primary Authorities

*Bach v. Law Sch. Adm. Council*, 2014 U.S. Dist. LEXIS 124632 (M.D.N.C. 2014)

CONCLUSION...................................................................................................................... 29

## PRELIMINARY STATEMENT

This case concerns the intersection of the Americans with Disabilities Act ("ADA") and high-stakes standardized testing. Plaintiff A.F. had virtually a straight-A grade point average in high school, including A's in numerous Honors and Advanced Placement ("AP") courses, achieved without extra testing time or any other disability-related accommodations. She also did extremely well on her ACT college admission test, with no accommodations, and on her standardized AP exams, gaining admission to Duke University. Her academic success continued at Duke, where she earned straight A's her first four terms without accommodations.

Despite this background, Plaintiff claims to be disabled within the meaning of the ADA. To be disabled under the ADA, a person must have a mental or physical impairment that substantially limits her ability to perform one or more major life activities, as compared to most people in the general population. Plaintiff has been diagnosed as having Attention Deficit Hyperactivity Disorder ("ADHD") and Other Specified Neurodevelopmental Disorders. Complaint ¶ 2. Based upon these diagnoses, she claims to be substantially limited in the major life activities of "reading, writing, concentrating, learning, test-taking, working, and the bodily function of brain function." *Id*. at ¶ 27. The evidence, however, does not support her claims.

Plaintiff's alleged impairments are neurodevelopmental impairments that would impact a person over the course of his or her lifetime. If the impairments resulted in substantial limitations in any major life activities relevant to academics or test-taking, the person's academic and test-taking histories would reflect the limitations. Far from having exhibited any such impairment, however, Plaintiff has excelled in the areas in which she claims to be impaired. Indeed, she is *exceptionally* accomplished. Throughout her life, she has excelled academically and on other

1

standardized tests, for the most part with no accommodations and while also staying busy with extra-curricular activities, jobs, internships, and volunteer positions.

Plaintiff is primarily relying on diagnoses that she received in 2023 from William Benninger, Ph.D. Plaintiff consulted Dr. Benninger for the specific purpose of getting support for her request for extra testing time on the Medical College Admission Test® (MCAT®). He has recommended that she be given extra testing time, but his diagnostic assessment results do not reflect substantial limitations. They instead reflect average to above-average performance in all domains that were evaluated, with only a handful of relative deficiencies in performance areas that are not needed when taking the MCAT (*e.g.*, auditory recall). The reports do not address whether, as compared to most people in the general population, Plaintiff is substantially limited in any of the major life activities in which she claims to be impaired. And the results in the reports show no such substantial limitation.

Because Plaintiff is not substantially limited in her ability to read, concentrate, or perform any other activity relevant to taking a written, multiple-choice, standardized test, she is not legally entitled to *any* accommodations on the MCAT. Defendant Association of American Medical Colleges ("AAMC") nevertheless approved two accommodations in response to her request for accommodations: stop-the-clock breaks, and a separate testing room. The only accommodation AAMC denied was her request for extra testing time.

In the motion now before the Court, Plaintiff seeks the extraordinary remedy of an expedited, mandatory injunction that would allow her to take the MCAT with 50% more testing time than other examinees receive. *See* Motion for Temporary Restraining Order and/or Preliminary Injunction. (Doc. # 1-1, PageID # 18 (attached to defendant's Notice of Removal) ("Pl. Mem.")). This is the relief she would otherwise receive only by prevailing on the merits.

- 2 -

The Court should deny Plaintiff's pending motion.  Plaintiff is not likely to prevail on the merits of her claim, because she is not disabled with the meaning of the ADA and, even if she were, she has not shown that she cannot take the MCAT in an accessible manner using the accommodations AAMC has approved.

Likewise, Plaintiff has not shown that she faces a risk of irreparable harm absent interim injunctive relief.  Her central alleged risk is that she will be delayed in enrolling in her preferred medical school if she cannot take the MCAT, with extra testing time, on the date she wants to take it (April 28, 2023). This alleged harm, supported by only her own assertions, is entirely speculative. More to the point, ample case law supports the proposition that a delay in getting into a university or graduate school does not constitute irreparable harm.

The balance-of-harms factor likewise does not weigh in her favor.  Her requested injunction would harm not only AAMC, but also the medical schools that rely upon MCAT scores and the individuals who will be competing with Plaintiff for admission to the medical schools to which she applies.  Finally, the public interest supports denying her motion, because the public has a strong interest in protecting the fairness and integrity of standardized, medical school admission tests.

## BACKGROUND

### I.      AAMC and the MCAT

AAMC is a not-for-profit membership association dedicated to transforming health through medical education, clinical care, biomedical research, and community collaborations. Decl. of Kathryn Bugbee ("Bugbee Decl.") ¶ 2 (Ex. 1 hereto, filed as Doc. # 12-1). Its members consist of 170 accredited medical schools, more than 400 teaching hospitals and health systems, and more than 70 faculty and academic societies.  *Id.*

AAMC develops and administers the Medical College Admission Test®, which is a standardized, multiple-choice examination.[1] The MCAT assesses an examinee's problem-solving abilities, critical thinking, and knowledge of natural, behavioral, and social science concepts and principles that are prerequisite to the study of medicine. *Id*. at ¶ 3. Medical schools rely upon MCAT scores as one factor among many in deciding who they will admit to their programs. *Id*.

The MCAT is administered by computer in third-party testing centers and lasts just over seven hours under standard conditions, with six hours of actual testing time. *Id*. at ¶¶ 4, 5. In 2023, there are thirty (30) testing dates for the MCAT, spread throughout the year. *Id*. at ¶ 6.

AAMC provides testing accommodations on the MCAT to individuals whose supporting documentation supports the conclusion that they are disabled within the meaning of the ADA and need reasonable accommodations to test in an accessible manner. *Id*. at ¶¶ 9-11. AAMC's objective in reviewing all accommodation requests is to provide "a valid exam while maintaining a level playing field for all test takers." *Id*. at ¶ 11. *Cf. Powell v. Nat'l Bd. of Med. Exam'rs*, 364 F.3d 79, 88-89 (2d Cir. 2004) (granting summary judgment on an examinee's claim that she had ADHD and was disabled withing the meaning of the ADA: "[The Board] . . . followed its standard procedure when it determined that appellant was not entitled to a test accommodation. Its procedures are designed to ensure that individuals with *bona fide* disabilities receive accommodations, and that those without disabilities do not receive accommodations that they are not entitled to, and which could provide them with an unfair advantage when taking the medical

---

[1] "When directions, testing conditions, and scoring follow the same detailed procedures for all test takers, the test is said to be standardized. Without such standardization, the accuracy and comparability of score interpretations would be reduced. For tests designed to assess the test taker's knowledge, skills, abilities, or other personal characteristics, standardization helps to ensure that all test takers have the same opportunity to demonstrate their competencies." Standards for Educational & Psychological Testing at 111 (2014).

licensing examination. As administrator of the national exam used by a number of states for licensing medical doctors, the National Board has a duty to ensure that its examination is fairly administered to all those taking it. Were the National Board to depart from its procedure, it would be altering the substance of the product because the resulting scores would not be guaranteed to reflect each examinee's abilities accurately.").

## II.    Plaintiff's Request for Accommodations on the MCAT

Plaintiff submitted her accommodation request on January 14, 2023, requesting 50% extra testing time.  Bugbee Decl. ¶ 15.   She supported her request with a personal statement and  two letters from a Physician Assistant named Pamela Campbell.  *See id.* ¶ 16.

In response to questions on the AAMC application form, Plaintiff stated that as "early as first grade" she had been "given accommodations that have helped with my struggle to read and absorb material as quickly as my peers."  *Id.* at ¶ 15, Ex. A at 3.  She provided no documentation, however, evidencing her receipt of any accommodation in elementary school, middle school, or high school. Plaintiff also stated that she had seen "psychiatrist Dr. David Scandinaro throughout high school, who diagnosed with me anxiety," and that during her time at Duke she "went to Dr. Mina Boazak and was diagnosed with ADHD and re-diagnosed with anxiety," *id.*—but she provided no documentation from either of these professionals reflecting their alleged diagnoses or addressing the extent of any alleged functional limitations for Plaintiff.

In her personal statement, Plaintiff noted that she had "one of the highest GPAs in [her] class" and took "AP classes," but she said that her standardized test scores "never reflected my academic success," giving as an example her performance on the "reading and science sections of the ACT."  *Id.* ¶ 16 and Ex. B.[2]  She also said that she "struggled with test taking" as she "entered

---

[2]   As discussed *infra* at 10-11, Plaintiff's best score on the ACT Science subtest was in the 95th percentile (*i.e.*, top 5%), and her best score on the Reading subtest was in the 60th percentile. While not as high as

college,"[3] pointing to a "Biology 201 class" where she purportedly "fixated on a single problem for over 30 minutes, rereading the passage and problem a number of times, but unable to concentrate." *Id.*[4]

In the affidavit filed in support of her pending motion, Plaintiff asserts that one of the other documents she submitted to AAMC was "a report and opinion letter from Dr. Boazak, a psychiatrist that documented ADHD diagnosis and a need for extended time on MCAT and breaks without penalty. . . ." Affidavit of A.F. at ¶ 4 (Doc. # 1-1, PageID # 35 (filed in state court on April 3, 2023, and as attached to defendant's Notice of Removal)); *see also* Complaint ¶ 16 (making the same assertion). This assertion is untrue. Neither a report nor an opinion letter was provided to AAMC by or from Dr. Boazak. *See* Bugbee Decl. ¶ 16.

What AAMC did receive from Plaintiff, as noted, were two letters from Pamela Campbell, a Physician Assistant who works in the same clinic as Dr. Boazak. In the first of those letters, dated November 14, 2022 and showing a "Date of Initial Evaluation" of October 28, 2022, Ms. Campbell stated in part as follows:

> Through the course of my work with [A.F.], I have conducted a comprehensive clinical evaluation (the current gold standard diagnostic approach recommended by the AACAP and AAP) aided by psychometric testing and it is my strong diagnostic impression that [A.F.'s] history is highly consistent with ADHD, combined type. She also has a history of Generalized Anxiety Disorder.... [A.F.] has minimal documentation of dysfunction in her childhood with academics, however what she does have available concurs with the ADHD diagnosis. In addition, she currently has accommodations at Duke which have shown to be beneficial during her time at the University. Given the extent of [A.F.'s] symptoms and the consequent related

---

scores she achieved on the English or Math subtests (99th and 98th percentiles, respectively), those scores do not reflect substantial limitations in her performance abilities, as compared to the abilities of most people in the general population.

[3] As discussed below, this purported "struggle" was not reflected in her grades, as she achieved straight A's in her first four semesters at Duke, with no accommodations.

[4] According to her Duke transcript, Plaintiff took a Biology 201 course in the Spring of 2021, and her grade was an A. Bugbee Decl. ¶ 17 Ex. G.

> dysfunction, it is my strong recommendation that [A.F.] be provided
> accommodations for the MCAT testing. In discussion with [A.F.], extension of
> testing time by 100% for the multiple choice/reading and writing portions of the
> testing would provide her the best opportunity to demonstrate her true capabilities.

Bugbee Decl. ¶ 16, Ex. C. Thus, according to Ms. Campbell, she is the person who evaluated

Plaintiff (not Dr. Boazak); the date of her Initial Evaluation of Plaintiff was October 28, 2022; she

evaluated her using a "comprehensive clinical evaluation . . . aided by psychometric testing"

(which she neither identified nor provided to AAMC); it was "her strong diagnostic impression"

that Plaintiff has ADHD; and, based on what Plaintiff told her, she recommended that Plaintiff

receive 100% extra time on the MCAT.

The second letter from Ms. Campbell dated December 23, 2022, stated in part as follows:

> I am writing on behalf of [A.F.], whom I have been treating for ADHD and anxiety.
> She is scheduled to take the MCAT on 1/27/23 and had requested a letter from me
> to support her request for additional time.... [A.F.] has experienced in the past
> difficulty with emotional regulation with standardized and non-standardized tests
> despite having many coping/study skills. This along with the executive dysfunction
> impairment associated with ADHD, has negatively impacted her testing
> performance in the past and failed to demonstrate her true academic potential....
>
> I am asking on behalf of [A.F.], the consideration for additional testing [time to] be
> allowed despite the delay in request.

*See* Bugbee Decl. ¶ 16 Ex. D.

Based on its review of Plaintiff's supporting documentation, AAMC denied her request for

additional testing time but approved the accommodation of stop-the-clock breaks. AAMC

informed Plaintiff of its decision in a letter dated March 1, 2023, which included an explanation

for the denial of extra testing time:

> You requested 50% extended time on the basis of ADHD and a psychiatric
> impairment. Your records document the diagnoses of ADHD and generalized
> anxiety disorder and support the need for time to manage symptoms on test day. To
> that end, we have approved additional time for breaks (i.e., stop the clock breaks)
> to provide opportunities for you to refresh your attentional resources, manage
> anxiety, regroup, and refocus without taking time away from test taking. There is

not sufficient evidence, or data (based on objective assessment), to support the need for more time to access and/or process the actual test content as would be consistent with the accommodation of extended testing time. We additionally note that documentation of performance on prior standardized testing was not submitted for review.

*See id*. ¶ 19 Ex. H.

Three days later, Plaintiff requested that AAMC reconsider its decision.  *See id*. ¶ 20.  Her cover note stated that she was enclosing a letter from her attorney (David Goldstein), two reports from William Benninger, Ph.D. (one of which was dated January 2023, the other March 2023), and her ACT scores.  *See id*. Ex. I.  Her note also stated that, in reviewing her application, she "realized I inadvertently checked that I had accommodations for the ACT. This was done in error." *Id.*

In his January 2023 report, Dr. Benninger diagnosed Plaintiff as having "ADHD Combined Presentation (314.01)."  Bugbee Decl. ¶ 20, Ex. K at 8.  He described the current severity of her ADHD as "Moderate" (5, on a scale of 1-9), *id.*, and stated that her Functional Data reflected "moderate cognitive and academic difficulties and mild home/community functioning difficulties," *id*. at 7.

Dr. Benninger's January 2023 report also included a heading titled "Comorbid/Coexisting Disorders," which stated as follows:

1.  Other Specified Neurodevelopmental Disorder (315.8) Working Memory and Other Executive Function Impairments

2.  Depressive Disorder (previously diagnosed)

3.  Anxiety Disorder (previously diagnosed)

*Id*. at 8.  Dr. Benninger did not separately discuss whether these impairments resulted in functional limitations for Plaintiff or, if so, the extent of any such functional limitations.

- 8 -

Despite having characterized the severity of Plaintiff's ADHD as "Moderate" and describing her Functional Data as reflecting "moderate cognitive and academic difficulties," Dr. Benninger asserted in the Recommendations section of his January report that Plaintiff "exhibits severe symptoms of inattention, working memory, initiate, plan/organize, organization of materials and task monitor." *Id.* at 10. Based on those allegedly "severe" symptoms, he recommended that she be given 50% extra testing time on the MCAT and allowed to test in a "quiet, distraction free environment" to "compensate for [her] difficulty with staying on task and being easily distracted by extraneous stimuli." *Id.* at 10-11. He also recommended that she take various stimulant and non-stimulant medications. *Id.* at 9.

Dr. Benninger prepared a supplemental report to support Plaintiff's request for extra testing time, dated March 2023. Bugbee Decl. ¶ 20 Ex. L. In this report, and presumably based upon Plaintiff's self-report, Dr. Benninger stated that Plaintiff had "exhibited significant impairment in all phases of homework completion in high school and college and has historically had severe difficulty persisting with uninteresting work and completing long-term projects." *Id.* at 1. He also stated that her "[t]ime judgment difficulties are chronic," *id.*, and that, "[i]n general, this individual indicates that she struggles to process information, is very disorganized, forgetful, misplaces and/or forgets important materials, has trouble sustaining her effort with uninteresting tasks and is inattentive," *id.* at 1-2. Dr. Benninger did not address the inconsistency between these self-reported symptoms and Plaintiff's lifetime of exceptional performance in school and on other standardized tests, achieved while engaging in numerous extra-curricular activities that, like the schoolwork and standardized tests, would require Plaintiff to be focused, organized, and attentive to time management. *See infra* at 10-14.

Dr. Benninger's March 2023 report provided the same diagnoses as his initial report: "ADHD Combined Presentation (314.01)" and "Other Specified Neurodevelopmental Disorder (315.8) Working Memory and Other Executive Function Impairments." *Id.* at 4.  And, as before, he characterized Plaintiff's ADHD as being of "mild severity," but then asserted that she has "severe inattentive symptoms" in attempting to justify Plaintiff's need for extra testing time.  *Id.* at 4-5.  He stated that the stop-the-clock breaks that AAMC approved were "important" and would allow Plaintiff to "reboot," but said that they would "not fully compensate" for her inattentiveness and she should also receive 50% extra testing time and be allowed to test in a "quiet, distraction free environment." *Id.*

The AAMC reviewed the additional materials and concluded that the request for extended time was not supported by the evidence.  In accordance with standard AAMC processes, prior to issuing its decision on the reconsideration request, AAMC consulted two independent, external professionals after receiving Plaintiff's reconsideration request and the reports from Dr. Benninger. Bugbee Decl. ¶ 22.  One of the experts is Dr. Allyson Harrison, and the other is Dr. Joseph Bernier.  Both concluded that Plaintiff had not shown that extra testing time was warranted in order to allow her to test on a level playing field.  *See* Bugbee Decl. Ex. N (Harrison report); Ex. O (Bernier report).

## III. Plaintiff's Academic and Standardized Testing History

Plaintiff is exceptionally gifted and accomplished. She attended the Columbus School for Girls from 2004 to 2019,[5] where—with no reported accommodations—she excelled academically while participating in numerous extracurricular activities.[6]  She was virtually a straight-A student

---

[5]  Plaintiff's dates of attendance are as reported on Plaintiff's LinkedIn pages, which are attached for the Court's convenience at Exhibit 3 to this brief.

in high school, where her only grade other than an A was a B+ in an Advanced Placement (AP) English & Composition class.  *See* Bugbee Decl. ¶ 17, Ex. F at 3.  Eight of her courses were AP courses. *Id*. In addition, she took Honors Algebra, Honors Biology, Honors Chemistry, Honors U.S. History, and Honors Physics, as well as Advanced Statistics.  *Id.* She participated in Interscholastic Athletics all four of her high school years, and in Concert Choir. *Id.*  And she received numerous academic honors and awards:  the Outstanding Physics Student of the Year in both 2017 and 2018 (awarded by the American Association of Physics Teachers); the BC Stott Award in AP Calculus in 2018; and the Science Cup in 2019, which is awarded to the Senior who "best reflects excellence in the sciences."  *See* Ex. 3 hereto, filed as Doc. # 12-3 (LinkedIn page).

When it came time to take her college admission test, Plaintiff took both the ACT and SAT exams, each of which is a standardized, multiple-choice exam (like the MCAT).  She took the ACT exam twice, as a Junior, and did extremely well both times, without extra testing time or any other accommodations. Her composite scores were in the 89th and 94th percentiles,[7] meaning that she scored in the top 11% and 6% of the more than 1.9 million students who took the ACT exam in 2018.[8]  Her best scores were in the 99th percentile (English and Math), and even her lowest score was solidly average (54th percentile, Reading).  Plaintiff did not provide her SAT scores to AAMC, but it is AAMC's understanding that also took that test with no accommodations.

---

[6]  The only academic records available to AAMC in preparing this brief were Plaintiff's high school and college transcripts and excerpts from her ACT score reports, which she provided to AAMC with her request for accommodations.

[7]  Plaintiff provided excerpts of her ACT score reports to AAMC, which showed her scores but not the corresponding percentile information. *See* Bugbee Decl. ¶ 20 Ex. M.  The percentile information discussed above is based upon an ACT document found at www.act.org/content/dam/act/unsecured/documents/MultipleChoiceStemComposite2017-18.pdf.

[8]  *See* Fast Facts: ACT scores (897) (ed.gov) (https://nces.ed.gov/fastfacts/display.asp?id=897).

On the strength of her exceptional high school record and admission test scores, Plaintiff was admitted to Duke University, one of the most selective universities in the country.[9]  She enrolled in the Fall of 2019 and was given college credit for six of the AP courses she took in high school.  Bugbee Decl. ¶ 17, Ex. G. (Duke transcript).  For most if not all those AP courses, she would have had to take an end-of-course, standardized AP exam lasting two to three hours.[10]

Plaintiff did not provide any of her AP exam scores to AAMC.  However, she must have done well to be awarded college credits (*i.e.*, scores of 4 or 5, which is the highest possible score).[11]  Students with disabilities can request accommodations on AP exams,[12] but Plaintiff did not do so and apparently did not need extra testing time on those standardized tests.

 Plaintiff's stellar academic performance continued at Duke.  With no accommodations, she achieved straight A's both semesters of her first year; an A on a course she took in the Summer Term after her first year; and straight A's in the Fall Semester of her second year.  *See* Bugbee Decl. Ex. G.  For reasons that are unclear (given her prior straight-A performance), she was given permission towards the end of her sophomore year to receive 50% extra time on her classroom tests and extra break time. *Id*., Ex. E.  AAMC does not know if she used those accommodations, but she continued to achieve straight A's in all her classes. *Id.*

---

[9]  For the Class of 2023 (Plaintiff's class), 41,651 students applied to Duke, and only 3,229 were accepted. *See* https://admissions.duke.edu/wp-content/uploads/2019/12/Duke-2023-Class-Profile.pdf.

[10]  *See generally* https://apstudents.collegeboard.org/ap-exams-overview/exam-timing-structure.

[11]  *Compare* Bugbee Decl. ¶ 17, Ex. G (Duke transcript) (listing the AP courses for which she was given college credits),  *with*  https://trinity.duke.edu/undergraduate/academic-policies/AP-credit-by-department (listing the scores required on AP exams to get course credit at Duke).

[12]  *See* https://apstudents.collegeboard.org/getting-accommodations.

While at Duke, Plaintiff worked as a Research Assistant in the Duke Center for Autism & Brain Development (Aug. 2020 to present), and the Duke Cancer Institute (Aug. 2022 to present). *See* Ex. 3 hereto at 1 (Plaintiff's LinkedIn pages). She served in the Office of Student Conduct and Community Standards as a Disciplinary Advisor (Aug. 2021–July 2022), and then as a Community Conduct Intern (July 2022 to present). *Id.* She also served as a Biochemistry Peer Educator in Duke's Academic Resource Center, as a volunteer at the Duke Center for Girls & Women with ADHD and at the Duke Home Care & Hospice, and as a volunteer on the First Year Advisory Council. *Id.* She was a member of various organizations (the Duke Consulting Club, the Duke Association for Business Oriented Women, and Alpha Phi sorority, where she has served as Vice-President for New Member Education). *Id.* at 2. And, as in high school, she has received multiple honors and awards: admission to the Phi Beta Kappa honorary society; chosen by the Dean and Duke's President to represent the Class of 2023 at the 2022 Commencement and Convocation; and Dean's List with Distinction from 2019 through 2022 (reflecting a GPA each year in the top 10% of all Duke undergraduates). *Id.* at 2.

This history shows that Plaintiff has achieved exceptional grades and standardized test scores, without accommodations and while also devoting countless hours to a range of work, volunteer, and extra-curricular activities. It is relevant because Plaintiff's claimed impairments are neurodevelopmental, lifelong impairments that would not suddenly arise or began to cause functional limitations in 2022 or 2023, when she first received her ADHD and "Other Specified Neurodevelopmental Disorder" diagnoses. The evidence shows that, even if her diagnoses are warranted, and even if they cause some functional limitations, her impairments are not disabilities under the ADA because they do not result in any substantial limitations. This is certainly true when her abilities are compared to most people in the general population (as they must be under

- 13 -

the ADA), but it is even true if her abilities are compared to those of her highly qualified peer groups.

## ARGUMENT

### I.     TRO And Preliminary Injunction Standard

A preliminary injunction is an "extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat'l Res. Def. Council,* 555 U.S. 7, 22 (2008).  "[T]he party seeking the injunction must establish its case by clear and convincing evidence," *Roe v. Director, Miami Univ., Office of Community Stds.*, No 1:19-cv-136, 2019 WL 1439585, *3 (S.D. Ohio April 1, 2019), and relief "should be granted only if the movant carries his or her burden of proving that the circumstances clearly demand it," *Overstreet v. Lexington-Fayette Urban Cty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002).

When a temporary restraining order or preliminary injunction is requested, "the Court must examine four factors: (1) whether the movant has made a strong likelihood of success on the merits; (2) whether the movant will suffer irreparable harm if the injunction is not issued; (3) whether the issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuing the injunction."  *Overstreet*, 305 F.3d. at 573.  The claimed irreparable harm must be "actual and imminent" rather than "speculative or unsubstantiated." *Abney v. Amgen, Inc.*, 443 F.3d 540, 552 (6th Cir. 2006).  "Moreover, when a party is seeking an order mandating affirmative action through the requested injunctive relief, the burden is heightened." *Shah v. Fortive Corp.*, No. 1:22-cv-312, 2022 WL 2193108, *3 (S.D. Ohio 2022) (denying TRO because of the absence of non-speculative irreparable harm).

## II.  Plaintiff Has Not Shown That She Is Likely To Succeed On The Merits

Plaintiff asserts that she "has a substantial likelihood [she] will prevail on the merits of her claims."  Pl. Mem. 5.  However, her cursory argument falls well short of supporting this assertion. It reduces to this:  Because two medical professionals diagnosed her with various impairments and recommended that she be given extra testing time on the MCAT, she is disabled within the meaning of the ADA, and AAMC must give her the accommodation her professionals recommended.  *See id.* at 3-5.  Plaintiff is wrong.

As an initial matter, it is important to clarify what the record actually shows.  Plaintiff claims to have been "diagnosed with multiple disorders, including Other Specified Neurodevelopmental Disorders, ADHD, Working Memory, and Other Executive Function Impairments, and Anxiety Disorder by multiple qualified and experienced licensed medical providers...." Pl. Mem. 2.  To support this assertion, however, she cites only two documents (attached to her brief as Exhibit A) which she characterizes as "expert opinion letters from psychologist William Benninger and Dr. Boazak."  *Id.* at 3.  According to Plaintiff, "[b]oth doctors have diagnosed Plaintiff with multiple disorders," and "both doctors have opined that Plaintiff must be provided accommodation of extra time due to her disability."  *Id.* at 3-4.

Contrary to these assertions, no expert opinion letter was provided to AAMC from or by Dr. Boazak, and no such letter has been provided to the Court.  Instead, Plaintiff has provided the Court with a December 23, 2022 letter from Pamela Campbell (discussed *supra* at 6-7).  Ms. Campbell is a Physician Assistant, not a "doctor."  Plaintiff acknowledges this but asserts that "Dr. Boazak has reviewed and concurred with the findings and conclusions" in Ms. Campbell's letter. Pl. Mem. 3 n.2.  Nothing in the record supports this assertion. Moreover, there are no "findings and conclusions" in Ms. Campbell's letter. Ms. Campbell simply states that she has been treating

Plaintiff for "ADHD and anxiety," asserts (with no first-hand knowledge) that Plaintiff has "experienced ... difficulty [in the past] with emotional regulation with standardized and non-standardized tests" and has not been able to demonstrate "her true academic potential," and asks "on behalf of [A.F.], the consideration for additional testing [time to] be allowed...." *Id.*, Ex. A. Ms. Campbell provided no diagnostic information and gave no opinion on whether Plaintiff "requires" extra testing time.

The other document cited by Plaintiff is Dr. Benninger's March 2023 Psychological Report (discussed *supra* at 8-9). Dr. Benninger is a psychologist, and his report diagnosed Plaintiff as having "ADHD Combined Presentation (314.01) moderate severity," and "Other Specified Neurodevelopmental Disorder (315.8) Working Memory and Other Executive Function Impairments." Pl. Mem., Ex. A at 4. The diagnoses refer to disorders recognized in the Diagnostic and Statistical Manual of Mental Disorders (5th Ed.), commonly referred to as the DSM-V. *See* Ex. 4 hereto, filed as Doc. # 12-4 (relevant pages from the DSM-V).[13]

There might well be reason to question Dr. Benninger's diagnoses. Plaintiff went to Dr. Benninger specifically to get support for extra time on the MCAT. Diagnoses provided in this context often do not meet applicable diagnostic criteria.[14] AAMC, however, did not question his

---

[13] The DSM does not recognize a separate disorder known as "Working Memory Impairment" or "Executive Function Impairment;" these appear to be elaborations of the "Other Specified Neurodevelopmental Disorder" diagnosis.

[14] *See, e.g.,* J. Joy, "Assessment of ADHD Documentation from Candidates Requesting [ADA] Accommodations for the National Board of Osteopathic Medical Examiners COMLEX Exam," 14(2) J. of Attention Deficit Disorders 104, 106 (2010) (discussing results of an independent professional review of requests for testing accommodations on a medical licensing exam from 50 individuals who claimed to have ADHD: of the 50 files reviewed, "only 14% (7 out of 50) of applicants provided sufficient clinical information to meet the criteria for ADHD").

In advocating for Plaintiff's receipt of extra testing time, Dr. Benninger based his findings and recommendations on "relative weaknesses rather than deficits," even though DSM-5 criteria "require clear evidence of impairment beyond symptoms and/or weaknesses found in an evaluation." *See* R. Mapou, *Have We Loosened the Definition of Disability? The Effects of Changes in the Law and Its Interpretation on*

- 16 -

diagnoses when it evaluated Plaintiff's request for MCAT accommodations.  It accepted that Plaintiff has one or more mental impairments.

Nor did AAMC question whether Plaintiff is substantially limited in any major life activities by virtue of her diagnosed impairments, so as to be disabled within the meaning of the ADA and legally entitled to reasonable accommodations. AAMC gave Plaintiff the benefit of the doubt on this point and focused instead on whether the documentation of her measured functional abilities supported the need for extra testing time in order to take the MCAT in an accessible manner. AAMC concluded that it did not.  *See* Bugbee Decl. ¶¶ 18-19; 21.  The same conclusion was reached by two well-qualified external professionals who carefully evaluated Plaintiff's request and supporting documentation at AAMC's request. *See id*. Exs. N (report of Dr. Allyson Harrison), *and* O (report of Dr. Joseph Bernier); *see also* Decl. of Joseph E. Bernier, Ph.D. ("Bernier Decl.") (Ex. 2 hereto, filed as Doc. # 12-2).

As discussed further below, no evidence has been presented that Plaintiff is substantially limited in any relevant major life activity when compared to most people in the general population. She must make that showing in order to have a viable ADA claim, and she has not done so. Moreover, even if she could show that she is disabled within the meaning of the ADA, she cannot show that she needs extra testing time to take the MCAT in an accessible manner. Extra testing time would instead give Plaintiff an advantage over other prospective medical students with whom she will be competing for admission, including individuals who are actually disabled within the meaning of the ADA.

---

*Clinical Practice*, Psychological Injury & Law 307, 312, 315 (2022) ("*[E]veryone* has strengths and weaknesses across different cognitive and life domains.... [W]e should stop recommending accommodations and medication for students who have relative weaknesses and are not truly disabled. Helping students without disabilities gain a competitive advantage is unfair to disabled students, especially those who have not had the resources that more privileged students have had.") (original emphasis)).

**A.      Disability Under the ADA:  Substantial Limitation in a Major Life Activity Compared to Most People in the General Population**

Section 12189 of the ADA provides as follows:

> Any person that offers examinations or courses relating to applications, licensing, certifications, or credentialing for secondary or postsecondary education, professional, or trade purposes shall offer such examinations or courses in a place and manner accessible to persons with disabilities or offer alternative arrangements for such individuals.

42 U.S.C. § 12189.  Pursuant to Section 12189, persons who qualify as disabled under the ADA are entitled to reasonable accommodations if needed to test in an accessible place and manner.

Having a diagnosed impairment is not the same thing as being disabled within the meaning of the ADA. To be disabled under the ADA, a person must have "a physical or mental impairment that substantially limits one or more major life activities," 42 U.S.C. § 12102(1), "as compared to most people in the general population."  28 C.F.R. § 36.105(d)(1)(v). Thus, in evaluating whether Plaintiff is substantially limited, her claimed limitations must be measured against the general population, not against college graduates, other prospective medical students, or her own expectations.  *See Singh v. George Wash. Univ.*, 508 F.3d 1097, 1103-04 (D.C. Cir. 2007); *Doherty v. Nat'l Bd. of Med. Exam'rs*, 791 F. App'x 462, 465 (5th Cir. 2019); *Black v. Nat'l Bd. of Med. Exam'rs*, 281 F.Supp.3d 1247, 1249-50 (M.D. Fla. 2017) ("Although Black insists that the Board must compare Black's performance to her 'medical-school peers,' under 28 C.F.R. § 36.105(d)(1)(v) the substantial-limitation determination depends on a person's performance in comparison to 'most people in the general population.'"); *Rumbin v. Ass'n of Am. Med. Colleges*, 803 F. Supp. 2d 83, 93 (D. Conn. 2011).

**B.      Plaintiff Is Not Disabled Within the Meaning of the ADA**

As noted above, AAMC is not questioning Plaintiff's assertion that she has one or more mental impairments.  AAMC denies, however, that any of her alleged impairments substantially

- 18 -

limit her ability to perform any major life activity relevant to taking the MCAT. And because she experiences no such substantial limitations, she is not disabled under the ADA.

As noted above, the thrust of Plaintiff's argument on the likelihood-of-success factor is that two professionals diagnosed her with multiple impairments and recommended that she be given extra time. She asserts that this meets her burden of showing that she is disabled within the meaning of the ADA and entitles her to the accommodations her professionals recommended. This is not an accurate statement of the law. Nothing in the ADA or any of its implementing regulations requires AAMC to defer to the findings or recommendations of an examinee's supporting professional, as another court recently explained in a directly analogous case:

> Mr. Wright … argues that the 'ADA effectively mandates that the Board provide accommodations based on the recommendations from professionals, such as Dr. Lucero, who has provided two first-hand in-person evaluations of Mr. Wright....' It would certainly make courts' jobs easier if that were the case. But a professional evaluation is not the only piece of evidence a court should consider under the ADA. A diagnosis alone does not satisfy the ADA disability standard.… Nor does Mr. Wright provide precedent that a diagnosis evaluation alone qualifies an individual as disabled under the ADA. In fact, courts have frequently denied motions for preliminary injunctions where the plaintiff had a professional evaluation and diagnosis.

*Wright v. Nat'l Bd. of Med. Exam'rs,* 2021 WL 5028463, at *7 (D. Colo. 2021) (denying examinee's motion for preliminary injunction that would have allowed him to take a licensing exam with extra testing time); *see also Valles v. ACT,* 2022 WL 2789900, *3-4 (E.D. Tex. 2022) ("Even accepting the diagnoses and evaluations from his physicians as true, Valles has not demonstrated that he will likely succeed in proving he has a disability for which he is entitled to receive accommodations under the ADA.") (denying motion for temporary restraining order that would have allowed plaintiff to take the ACT exam with extra testing time).

Remarkably, Plaintiff has not provided *any* discussion of why she is disabled within the meaning of the ADA. Relevant facts, however, do not go away simply because they are ignored.

- 19 -

The most reliable indication of whether Plaintiff is substantially limited in her ability perform any activities that are relevant to taking the MCAT [15] is how Plaintiff has performed in other real-world or objectively measured settings which required her to perform those activities. Her experience taking other high-stakes standardized tests is the most obvious source of such information, but her broader academic and work experiences are also relevant, as are diagnostic assessment results.

As discussed above, Plaintiff's standardized testing history, educational history, and work history provide no evidence that she is substantially limited in her ability to read, concentrate, or perform any activity that is relevant to taking the MCAT. They support the opposite conclusion.

Focusing first on her performance on other standardized tests, numerous courts have recognized that individuals who perform at the level that Plaintiff has performed—with no extra testing time or other accommodations—are not substantially limited in their ability to read, think, and concentrate as compared to most people in the general population and thus are not disabled under the ADA. *See, e.g., Gonzales v. Nat'l Bd. of Med. Exam'rs*, 225 F.3d 620, 630 (6th Cir. 2000) (noting, among other evidence, that plaintiff achieved "an average score" on the SAT with no accommodations and also "took the MCAT twice without accommodations") (preliminary injunction denied because plaintiff examinee with a diagnosed learning disability was not likely to succeed on the merits of his ADA claim); *Wright v. Nat'l Bd. of Med. Exam'rs,* 2021 WL 5028463 (holding that plaintiff was not likely to succeed in showing that he is disabled under the ADA and

---

[15]   Plaintiff claims to be substantially limited in the "major life activities" of "reading, writing, concentrating, learning, test-taking, working, and the bodily function of brain function."  Complaint ¶ 27. Some of these activities are not relevant when taking the MCAT (*i.e.*, writing, learning, and working), and it is at least questionable whether test-taking is a major life activity.  *See Hentze v. CSX Transp., Inc*., 477 F. Supp.3d 644, 664-67 (S.D. Ohio 2020) (Cole, J.) ("the Court determines that Hentze cannot rely on test taking as a major life activity in support of his ADA claim"). AAMC is not sure what Plaintiff means when she says that she is substantially limited in the major life activity of "bodily function of brain function." That leaves reading and concentrating as the relevant major life activities for purposes of this case.

- 20 -

noting, among other facts, that he "had a history of impressive academic success with average to slightly below average performances on standardized tests as compared to more competitive groups"); *Black v. Nat'l Bd. of Med. Exam'rs,* 281 F.Supp.3d at 1251 (relying, among other evidence, on plaintiff's average or above-average performance on the MCAT and other standardized examinations in holding that plaintiff was not disabled within the meaning of the ADA despite being diagnosed with ADHD by a qualified professional, and stating that "average (or above-average) performance presumptively establishes the absence of substantial limitation" when evaluating a person's ability to perform "in comparison to 'most people in the general population'"); *Glueck v. Nat'l Conf. of Bar Exam'rs*, 2018 WL 3977891, *6 (W.D. Tex. 2018) ("The conclusion that Plaintiff is not disabled under the ADA is supported by the fact that he succeeded academically in primary and secondary school and college without requesting or receiving accommodations, took the SAT and ACT without requesting or receiving accommodations, and took the LSAT without accommodations and scored in the average range."); *Healy v. Nat'l Bd. of Osteopathic Med. Exam'rs*, 870 F.Supp.2d 607, 621 (S.D. Ind. 2012) ("Matthew's above-average standardized testing scores [on the ACT and SAT] ... during which he received no accommodation ... stand as testament to his ability to read, learn, think, and concentrate just as well, if not better, than the general population."); *Rumbin v. Ass'n of Am. Med. Colleges*, 803 F. Supp. 2d 83, 95 (D. Conn. 2011) (noting plaintiff's prior "test-taking without accommodations," in holding that he was "not substantially limited in the major life activities of seeing, learning, and reading"); *Love v. Law Sch. Adm. Council,* 513 F. Supp. 2d 206, 214 (E.D. Pa. 2007) (holding that plaintiff with LD and ADHD diagnoses was not disabled under the ADA and denying accommodations on the LSAT, where, among other evidence, plaintiff had ACT and SAT scores "within the average range" with no accommodations).

Plaintiff's available school history also refutes any argument that she is substantially limited compared to most people in the general population with respect to reading, concentrating, or any other major life activity relevant to taking the MCAT. She was an exceptional student throughout high school, achieving exceptional grades in demanding courses with no accommodations. *See supra* at 10-13.

Of chief importance, there is nothing in Dr. Benninger's 2023 diagnostic evaluation reports that would support a finding that Plaintiff is substantially limited in any major life activity as compared to most people in the general population. High academic achievement does not preclude the existence of a disability protected by the ADA, *Berger v. Nat'l Bd. of Med. Exam'rs*, No. 1:19-cv-99, 2019 WL 4040576, *23 (S.D. Ohio 2019), but the required degree of functional impairment must be evidenced by a candidate's diagnostic information or other probative evidence.[16] That is not the case here. Plaintiff has not submitted any evidence that explains how she has been able to consistently excel academically and on other standardized tests without extended time accommodations.

Apart from a passing characterization of Plaintiff's "Functional Data" as reflecting "moderate cognitive and academic difficulties and mild home/community functioning difficulties," Bugbee Decl. ¶ 20, Ex. K at 7, Dr. Benninger did not really address the severity of the functional limitations that Plaintiff experiences (if any) as a result of her diagnosed impairments. In particular, he did not address whether Plaintiff is substantially limited in her ability to perform any relevant major life activities as compared to most people in the general

---

[16] In *Berger*, for example, the plaintiff had a history of documented accommodations, and his diagnostic assessment results evidenced actual impairment, not simply relative strengths and weaknesses. On those facts, and with plaintiff facing the risk that he would be dismissed from medical school, the court granted plaintiff a preliminary injunction that would allow him to take a standardized licensing exam with extra testing time (although it later found that there was a substantial issue on whether plaintiff had actually faced irreparable harm, sufficient to warrant reconsideration of its ruling, 2020 WL 2110576 (S.D. Ohio 2020)).

population. Thus, his report does not support the conclusion that Plaintiff is disabled within the meaning of the ADA. *See Hentze v. CSX Transp., Inc*., 477 F. Supp.3d 644, 669 (S.D. Ohio 2020) (Cole, J.) ("Hentze needs to offer some evidence that correlates the anxiety he experiences when faced with testing to the effect that anxiety has on his test performance, and how his resulting test performance compares to the population at large.... Absent such evidence, Hentze cannot avoid summary judgment on the substantially limited prong of the definition of disability.").

The diagnostic assessments administered to her by Dr. Benninger reflected performance in the average or above-average range in all areas that were assessed. *See* Bugbee Decl. ¶ 21; *id.* Ex. N (Dr. Harrison's report); Bernier Decl. at ¶ 10. As one court has noted regarding such diagnostic results, "[b]y definition, 'average' is not 'substantially limited.'" *Healy v. Nat'l Bd. of Osteopathic Med. Exam'rs*, 870 F.Supp.2d 607, 620 (S.D. Ind. 2012) (holding that plaintiff with "average to low average" diagnostic testing results was not disabled within meaning of the ADA and thus was not entitled to accommodations on his medical licensing exam, despite having been diagnosed with learning disabilities and not having answered all questions when he took the SAT and ACT exams with no accommodations); *see also Gonzales v. Nat'l Bd. of Med. Exam'rs,* 225 F.3d at 627 (noting that plaintiff "scored within the average range" on his diagnostic "reading comprehension tests," and holding that plaintiff was not substantially limited by his learning disability "because he can read as well as the average person"); *Valles v. ACT*, 2022 WL 2789900 at *3 (holding that plaintiff was not disabled within the meaning of the ADA despite the fact that his professional's diagnostic report identified areas of relative weakness in working memory and oral reading fluency (similar to the relative weaknesses that Dr. Benninger says exist for Plaintiff), because "even with these weaknesses, most of [his] abilities still fell within the average, above average, or superior range"); *Rawdin v. Am. Bd. of Pediatrics*, 985 F. Supp.2d 636, 651-52 (E.D. Pa. 2013) (noting that

- 23 -

plaintiff's diagnostic test scores were "all either in the average or above average range," and holding that plaintiff was not substantially limited in comparison to the general population), *aff'd on other grounds*, 582 Fed. App'x 114 (3d Cir. 2014); *Baer v. Nat'l Bd. of Med. Exam'rs*, 392 F.Supp.2d 42, 46 (D. Mass. 2005) ("Overall, the plaintiff's performance on the diagnostic testing was within the average range, sometimes low average, sometimes high, with occasional scores above and below the average range.") (plaintiff was not disabled under the ADA).

Congress intended to broaden the coverage of the ADA when it enacted the ADA Amendments Act of 2008 ("ADAAA"). That broadening, however, does not help Plaintiff. A plaintiff must still prove that she is disabled within the meaning of the statute, and that still requires demonstrating that plaintiff's alleged impairment substantially limits a relevant major life activity. *See, e.g., Mann v. Louisiana High Sch. Athletic Ass'n.*, 535 Fed. App'x 405, 410 (5th Cir. 2013) ("[A] plaintiff must still show substantial limitation....") (setting aside preliminary injunction in case involving a diagnosed anxiety disorder). While ADHD and other cognitive impairments can be disabilities under the ADA, they are disabilities only if they substantially limit a person's ability to perform major life activities as compared to most people. The evidence here does not support such a finding.

**C.     Even if Plaintiff Could Show that She is Disabled Under the ADA, She Has Not Shown that the Accommodations Approved by AAMC were Unreasonable**

Being disabled within the meaning of the ADA does not automatically entitle someone to accommodations. Accommodations may or may not be needed to address a person's functional limitations. Moreover, a person who is disabled under the ADA is not entitled to "the *best* accommodations or his *preferred* accommodations, but only to a reasonable accommodation." *Knox County, Tenn. v. M.Q.*, 62 F.4th 978, 1001 (6th Cir. 2023) (original emphasis).

- 24 -

In the context of accommodations on an examination, reasonable accommodations should enable a disabled individual to test in an accessible place and manner.  The goal is to ensure that the individual tests on a level playing field with other examinees, not to ensure optimal testing conditions or to enable that individual to maximize her performance. The two accommodations that AAMC approved for Plaintiff were clearly sufficient to ensure this outcome. AAMC has approved stop-the-clock breaks and a separate testing room, both of which address her core alleged functional limitations relating her to inattentiveness, without providing an accommodation—extra testing time—that has the greatest likelihood of inappropriately affecting the validity of a resulting test score absent a legitimate need for extra testing time.

Plaintiff's initial burden is to establish that she is disabled within the meaning of the ADA. For reasons already explained, she has that burden.  If she could do so, it would likewise be her burden to show that the accommodations approved by AAMC are unreasonable because they would not enable her to take the MCAT in an accessible manner. She has offered only conclusory assertions in this regard, all of which are refuted by her history of taking other standardized tests with no accommodations whatsoever.

## III.    Plaintiff Has Not Shown A Risk Of Irreparable Harm

Absent a risk of non-speculative irreparable harm, an interim injunction is unwarranted regardless of one's likelihood of success on the merits.   No such risk exists here.

Citing only her own affidavit, Plaintiff makes the following irreparable harm argument:

> Plaintiff is scheduled to take the MCAT on April 28, 2023. If Plaintiff does not take the MCAT with the 50% extended accommodation on April 28, 2023, ensuring her full and equal access to the MCAT, she will be irreparably harmed because she will lose the extensive time, she has invested in preparation for the MCAT. She will also be prevented from competing on a level playing field with other candidates sitting for the MCAT, and she will be further delayed or prevented from proceeding with her application to medical school. Additionally, Plaintiff's professional opportunities will be severely curtailed. *See* Exhibit D - Affidavit of Plaintiff.

> It is well known that there is a distinct advantage to applying when applications open to medical school because of how medical schools adjudicate applications. The earlier one applies, the better chance of admission to medical school. If the MCAT is not taken with the accommodation by the date requested, the scores will not be available for application, and Plaintiff will be at a severe disadvantage.

Pl. Mem. 2; *see also id.* at 5-6.  These arguments fall short of establishing, with evidence, a clear likelihood that Plaintiff will suffer non-speculative irreparable harm absent her requested injunction.

First, regardless of when she tests, Plaintiff will not "lose the extensive time she has invested in preparation for the MCAT."  Her preparation time will be no less useful if she tests in November than if she tests on April 28th.  If anything, she will benefit from having additional study time.

Second, Plaintiff will not be "prevented from competing on a level playing field" if she cannot test with 50% extra testing time on April 28, 2023.  The reality is that, for Plaintiff, testing on a level playing means testing with no extra testing time.  She is not disabled within the meaning of the ADA, and she does not need extra testing time to take the MCAT in an accessible manner. She is not seeking to test on a level playing field; she is seeking to test under more advantageous testing conditions than other examinees, to increase her likelihood of achieving an excellent MCAT score.

Third, Plaintiff offers no evidence to support her assertion that testing on one of the twenty-one additional testing dates available in 2023 rather than April 28th will "severely curtail" her professional opportunities.  *See* Bugbee Decl. ¶ 27 (MCAT testing calendar).

Finally, while taking the MCAT on a different date than April 28, 2023 might affect when medical schools receive her MCAT scores, it would not delay her from submitting her application because she can do so without having the score, as many candidates do; her MCAT score(s) would

simply populate in the electronic application later. She has presented no evidence that this would prevent her from being admitted to medical school in the Fall of 2024, which is the next available entering class for applications submitted in 2023. She asserts that it is "well known" that your chances of being admitted to medical school improve the earlier you apply, but she offers no evidence to support this. She does not even state which medical schools she wants to apply to or what the application deadlines are for those schools (deadlines generally range from October through the end of December).

The more fundamental problem with her argument, however, is that a delay in one's college or graduate school educational program does not constitute irreparable harm. *See, e.g., Garfield v. Middle State Univ.*, 2021 WL 9979155, *1-2 (M.D. Tenn. 2021); *Roden v. Floyd*, 2018 WL 6816162, *5 (E.D. Mich. 2018); *Doe v. Ohio State Univ.*, No. 2:15-cv-2830, 2016 WL 692547, *10-11 (S.D. Ohio 2016); *Pierre v. University of Dayton*, 143 F.Supp.3d 703, 714 (S.D. Ohio 2015) ("suspension from school is not irreparable"); *Oser v. Capital Univ. Law School*, No. 2:09–cv–709, 2009 WL 2913919, *11 (S.D. Ohio 2009). Therefore, even if Plaintiff had offered evidence showing that her enrollment in medical school in the Fall of 2024 requires that she test on April 28, 2023, the risk of delayed enrollment would not constitute irreparable harm.

Plaintiff's irreparable harm argument is also speculative in an additional way. It posits that she has to have extra testing time in order to get admitted into medical school on her desired schedule, but that is not the case. She can test on April 28th with the accommodations approved by AAMC, and there is every reason to believe she would get a very good MCAT score, just as she did on her college admissions tests. This would allow her to submit her medical school applications when she says she wants to do so. To suggest that she would not do well enough to get admitted to her desired medical schools if she tests without extra testing time is entirely

speculative. And speculative harm cannot support a preliminary injunction. *See Qui v. Univ. of Cincinnati*, No. 1:18-cv-634, 2018 WL 4496304, *8 (S.D. Ohio Sept. 19, 2018) (denying preliminary injunction in a case asserting claims under the ADA and Section 504 where student failed to present evidence that "enrollment in the University of Cincinnati's CCM program is the only way he can maintain his valid nonimmigrant status [and avoid deportation]"); *Nimmer v. Case Western Reserve Univ.*, 2018 WL 5118306, *5-6 (N.D. Ohio 2018) ("A claim of injury must be based on reliable evidence and what Plaintiff offers is not. It is not clear that absent an injunction at this point in time, Plaintiff will be unable to complete his education at CWRU (albeit with a later graduation date), finish dental school elsewhere or pursue his chosen profession."); *Doe v. Ohio State Univ.*, 2016 WL 692547 at *10-11 (denying medical student's motion for a preliminary injunction reinstating him as a student in good standing, where student "offered only his own testimony that residencies are more likely to be obtained by someone who is a student in good standing"), *objections overruled, report aff'd*, 2016 WL 1578750 (S.D. Ohio 2016); *see also Bach v. Law Sch. Adm. Council*, 2014 U.S. Dist. LEXIS 124632, *5-6 (M.D.N.C. 2014) (noting that plaintiff's argument regarding his likely test results if he tested without accommodations was speculative, as he had successfully taken other standardized tests without accommodations) (denying preliminary injunction); *Oser v. Capital Univ. Law School*, 2009 WL 2913919 at *11 (claims of dignitary harm, emotional loss, and inability to gain admission to another law school too conjectural to support a preliminary injunction preventing plaintiff from being dismissed from school); *Baer v. Nat'l Bd. of Med. Examiners*, 392 F.Supp.2d 42, 49 (D. Mass. 2005) ("[I]t is not certain that [plaintiff] will suffer the predicted harm; she may pass the test.") (denying preliminary injunction).

IV.     **An Injunction Would Harm Others**

Plaintiff asserts that "no harm will come to Defendant if an injunction is issued.  An injunction will merely protect Plaintiff."  Pl. Mem. 6.  That is not the case.

AAMC has a strong interest in ensuring that the MCAT is fairly administered to all examinees.  *See Powell v. Nat'l Bd. of Med. Exam'rs*, 364 F.3d at 88-89.  AAMC is therefore harmed if an examinee tests with unwarranted accommodations.  And once scores are reported and acted upon, the harm to AAMC cannot be undone.  *See Rothberg v. Law Sch. Adm. Council*, 102 Fed. App'x 122, 125 (10th Cir. 2004) (noting that the balance-of-harm factor favored LSAC, given the harm it would suffer once it reported the accommodated LSAT score, even if it eventually prevailed, and vacating preliminary injunction).

Other medical school applicants would also be harmed by Plaintiff's requested injunction.  Although she claims she is simply seeking to "compet[e] on a level playing field with other candidates," Pl. Mem. 5, she is seeking a benefit that is denied to other candidates.  She wants extra testing time because medical school admissions are competitive, and she wants to get as high an MCAT score as she can.  Her success in gaining an admission to a medical school, however, would necessarily come at the expense of other candidates seeking admission to that school.

Finally, medical schools are harmed if they admit an applicant on the strength of an MCAT score obtained with unwarranted accommodations.  They will have allocated one of their limited medical school positions based, in part, on unreliable information.

VI.     **An Injunction Would Not Serve The Public Interest**

Plaintiff asserts that the public "has a strong interest in seeing that one's disability is accommodated when taking standardized tests." Pl. Mem. 6. That argument, however, is based upon the incorrect premise that Plaintiff is disabled under the ADA and likely to succeed on the merits of her claim. Moreover, "[a]lthough the public certainly has an interest in the enforcement

- 29 -

of the ADA, ... the public also has an interest in the fair administration of standardized tests." *Bach v. LSAC*, 2014 U.S. Dist. LEXIS 124632 at *7-8.

**CONCLUSION**

Plaintiff's motion for a TRO or preliminary injunction order should be denied.

Dated: April 14, 2023                     Respectfully submitted,


/s/  Erin D. French
Erin D. French (0090813)
Vorys, Sater, Seymour and Pease LLP
301 East Fourth Street, Suite 3500
Cincinnati, Ohio 45202
Phone: 513-723-4022
Email: edfrench@vorys.com

Robert A. Burgoyne
(Admitted *pro hac vice*)
Perkins Coie LLP
700 Thirteenth Street, N.W. Suite 600
Washington, D.C.  20005-3960
Phone:  202-654-1744
RBurgoyne@perkinscoie.com

Counsel for Association of American Medical Colleges

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing document was electronically filed on April 14, 2023, via the Court's CM/ECF System, which will send notification of such filing to counsel of record for Plaintiff.

s/  *Erin D. French*
Erin D. French