**IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| A.F., | : | CASE NO.: 2:23-cv-01241 |
| | : | |
| Plaintiff, | : | JUDGE SARGUS |
| | : | |
| vs. | : | MAGISTRATE JUDGE |
| | : | |
| ASSOCIATION OF AMERICAN | : | |
| MEDICAL COLLEGES | : | |
| | : | |
| Defendants. | : | |

**PLAINTIFF A.F.'S NOTICE OF FILING OF EXHIBITS IN SUPPORT OF HER
SUPPLEMENTAL BRIEF FOR A TEMPORARY RESTRAINING ORDER AND/OR
PRELIMINARY INJUNCTION**

Now comes Plaintiff A.F., by and through her counsel David A. Goldstein Co., L.P.A., and

hereby gives notice of the filing of the following exhibits in support of her Supplemental Brief for a

Temporary Restraining Order and/or a Preliminary Injunction:

1. Exhibit D: Declaration of David Goldstein and Exhibits 1-2.

2. Exhibit E: Declaration of William Benninger, PH.D. and Exhibit 1.

Respectfully submitted,

*/s/ David A. Goldstein*
**DAVID A. GOLDSTEIN (0064461)**
DAVID A. GOLDSTEIN CO., L.P.A.
511 South High Street
Suite 200
Columbus, Ohio 43215
(614) 222-1889
(614) 222-1899 (Fax)
E-mail: dgoldstein@dgoldsteinlaw.com
*Trial Attorney for Plaintiff A.F.*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document has been sent via Electronic Mail this

5th  day of June 2023 to:

Erin D. French (0090813)
Vorys, Sater, Seymour, and Pease LLP
301 East Fourth Street, Suite 3500
Cincinnati, Ohio 45202
Phone: 513-723-4022
Email: edfrench@vorys.com

Robert A. Burgoyne
(*pro hac vice* application forthcoming)
Perkins Coie LLP
700 Thirteenth Street, N.W. Suite 800
Washington, D.C.  20005-3960
Phone:  202-654-1744
RBurgoyne@perkinscoie.com

Counsel for Defendant AAMC


*/s/ David A. Goldstein*
**DAVID A. GOLDSTEIN (0064461)**

Exhibit D

**IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| A.F., | : | CASE NO.: 2:23-cv-01241 |
| | : | |
| Plaintiff, | : | JUDGE SARGUS |
| | : | |
| vs. | : | MAGISTRATE JUDGE |
| | : | |
| ASSOCIATION OF AMERICAN | : | |
| MEDICAL COLLEGES | : | |
| | : | |
| Defendants. | : | |

**DECLARATION OF DAVID A. GOLDSTEIN**

I, David A. Goldstein, declare the following under penalty of perjury:

1.  I am over 18 years of age and otherwise competent to make this declaration. I have personal knowledge of the facts stated in this declaration.

2.  After the suit was filed, Defendant produced two reviewers' written reports setting forth their basis for not allowing the accommodation. Based upon these reports and other conversations, Plaintiff submitted additional information to Defendant.

3.  On May 4, 2023, at 7:44 p.m., the undersigned counsel received Exhibit 1 attached hereto, whereby Defendant approved a 25% extra time accommodation.

4.  On May 31, 2023, Plaintiff received Defendant's external reviewer Mark Greenberg report, which is attached hereto as Exhibit 2.

I declare under penalty of perjury that the foregoing is true and correct.


/s/ David Goldstein
David Goldstein



AAMC

Medical College
Admission Test®

# MCAT Accommodations Services

**AAMC ID: 15951618**
**Status: Partial Approval**
**Accommodations Expire: End of testing year 2024**

Exhibit 1

**5/4/2023**

Dear AF

Your request for reconsideration has been approved for the following accommodations:

- Standard time +25%
- Testing over two days (necessary for standard time + 25%)

Please note: You will receive a 15-minute break between test sections each day, rather than the regularly scheduled 10-minute break.

This is in addition to your previously approved accommodation(s):

- Stop the clock breaks: 30 minutes of flexible break time per day for two days (60 minutes total)
- Separate testing

You requested 50% extended time. We have reviewed your application and given considerable weight to the recommendations of your qualified professional as well as your history of accommodations, both formal and informal. However, the available objective psychometric, educational, and clinical data does not establish a level of functional impairment that would warrant the provision of that level of accommodation. Your records appear to show a high functioning individual with manifestations of ADHD that were mild enough to evade detection until late adolescence/early adulthood and allowed you to compensate effectively in the academic realm until college. In fact, you have performed in a stellar fashion in spite of the reported mood, attentional, and reading challenges. The characterization of your attentional difficulties as severe is based on self-reported symptoms rather than the evidence of real-life functioning or findings of objective assessment, the latter of which showed relative, not normative, weakness on measures of limited relevance to the MCAT exam. As such, in consideration of the additional information submitted with your reconsideration request, when reviewed with the previously submitted documentation, 25% extended time has been approved to address the combined effects of anxiety and mild reading inefficiencies.

We hope that this helps you understand the rationale for our determination. Be assured that your application materials have been treated with due respect, fairness, and confidentiality. For more information about the review process, see **"Understanding the Clinical Review Process"** on our website. Please review the information on the following pages regarding next steps in the accommodations process.

Sincerely,

MCAT Accommodation Services
**accommodations@aamc.org**
**www.aamc.org/mcat/accommodations**

MCAT® is a program of the Association of American Medical Colleges

The Association of American Medical Colleges is committed to providing appropriate accommodations to individuals with disabilities as defined by relevant federal law.



## Finish the process…

**Read the following inserts for instructions:**

- **I've Been Approved, What's Next?**

- **What Can I Expect When I Arrive at the Test Center?**

## Determination questions?

- **Contact us at accommodations@aamc.org.**

- **Your evaluators can contact us, but don't forget to submit a release form using the Service Request function within the MCAT Accommodations Online system.**

## Requesting re-review

- **If you feel you still need an accommodation that was not approved or have additional documents to submit, you may seek a re-review of your request. For more information see the "What Are My Options for a Re-review?" insert.**

## Preparation resources

- **Visit the MCAT Official Prep Hub to learn more about accommodations for practice tests.**

**Please note that the 2023 testing year ends on September 9, 2023; see our website for all applicable time guidelines.**

MCAT® is a program of the Association of American Medical Colleges

The Association of American Medical Colleges is committed to providing appropriate accommodations to individuals with disabilities as defined by relevant federal law.



## I've Been Partially Approved. What's Next?

Your request for accommodations was partially approved. Please review your determination letter to learn the specific reason(s) this determination was made.

**If you would like to schedule an exam with your approved accommodations, please follow the steps outlined below:**

- Confirm that your approval was received in time to allow scheduling of your exam with accommodations. You must be approved for accommodations and have a scheduling request submitted with Pearson VUE at least 15 days prior to your exam to allow time for us to prepare and implement any approved accommodations. If you are approved for accommodations after this time frame, your accommodations will not be available for your exam. However, you do have the option to test under standard conditions (i.e., without accommodations) and your approved accommodations will be made available for future exams. In accordance with standard scheduling policies and fees, you have until 10 days prior to an exam to reschedule or cancel. All scheduling is based on availability.

- If you have not already done so, complete the registration process in the MCAT Registration System. Pearson VUE may refer to this as receiving "authorization" from AAMC. You must complete this registration step each time you wish to schedule a new exam appointment.

- **Contact Pearson VUE at 1-800-466-0450 to schedule a date and location with your approved accommodations.** Pearson VUE representatives will have the most up-to-date information about appointments that are able to support delivery of your approved accommodations.

Please note, if you have already scheduled a standard (non- accommodated) exam appointment online through the MCAT RegistrationSystem, or elect to do so in the future, it is not guaranteed that your appointment will be able to support delivery of your approved accommodations. You will still need to contact Pearson VUE (per the instructions above) to add your accommodations to that appointment and ensure delivery of your approved accommodations.

MCAT® is a program of the Association of American Medical Colleges

The Association of American Medical Colleges is committed to providing appropriate accommodations to individuals with disabilities as defined by relevant federal law.



**Cancellations and Rescheduling:** If your approved accommodations have been confirmed by Pearson VUE for your exam, changes to or cancellation of that exam must be done by phone with Pearson VUE (*1-800-466-0450*); all standard MCAT scheduling deadlines and fees apply. It is your responsibility to confirm your appointment has been cancelled. The status of your appointment may be viewed in the MCAT Registration System.

### Please keep the following in mind:

- While we make every effort to keep your original test date and location, we may need to make some changes to your appointment to ensure we can provide your approved accommodations. If changes are needed, we will schedule you for the closest test site/date possible. Appointments are subject to availability.

If you decide to test without one or more of your approved accommodations, you must submit a Disability Accommodation Waiver Form at least ten days before your test date. The Accommodations Waiver can be found under "Service Requests" in MCAT Accommodations Online, our online application system.

## What Can I Expect When I Arrive at the Test Center?

### General:

- **Arrive early.** Please arrive 30 minutes before your scheduled start time to allow for the check-in process.

- **All standard identification policies apply.** Visit our website for more information.

- Please keep in mind that you will be required to adhere to standard test-day policies and procedures. These procedures are outlined in the MCAT Essentials, available online at www.aamc.org/mcat. The MCAT Essentials

- is mandatory reading for all examinees.

- Headphones are provided at each workstation to help with noise reduction. Earplugs can also be provided by Test Center staff, upon request.

- The Test Administrators are there to help you. Raise your hand if you have any concerns during the test.

MCAT® is a program of the Association of American Medical Colleges

The Association of American Medical Colleges is committed to providing appropriate accommodations to individuals with disabilities as defined by relevant federal law.



**Specific to Testing with Accommodations:**

- Please bring your approval letter with you to the test center on test day.
- If you have been approved for separate testing, it will be available to you after you have checked in with the Test Center Administrators. Separate testing rooms are not soundproof. We encourage you to use earplugs (see above) in conjunction with the provided headphones to help minimize distractions.

If you have been approved to bring in a personal item, such as food, drink, medication, or any type of medical equipment, you will be asked to present it for inspection. This is to ensure the security of the exam. If you or your evaluator have any questions regarding our review process, please contact us at accommodations@aamc.org.


## What are My Options for Requesting a Re-Review?

Review your determination letter to learn the specific reason(s) your requested accommodations were not approved. You also may want to share the letter with your evaluator for further review or explanation.


**If you would like us to review your application again, the following options are available to you:**

- **Submit a Reconsideration.** *If you have additional information to provide,* you may submit a Reconsideration. Collect all additional documentation supporting your request and apply for a Reconsideration via MCAT Accommodations Online. Please note, the additional information submitted with your Reconsideration request should be **new** and **substantial** in that it is information that we have not received before and adds to our understanding of your functioning (e.g., new test results, information from a different qualified professional, etc).

- **Submit an Appeal.** *If you do not have any new and substantial information,* submit an application for an Appeal via MCAT Accommodations Online. Please be aware that you may submit an Appeal

  only once, and the decision is final. As such, carefully consider whether a

MCAT® is a program of the Association of American Medical Colleges

The Association of American Medical Colleges is committed to providing appropriate accommodations to individuals with disabilities as defined by relevant federal law.



Reconsideration or an Appeal is the next best step. If you can gather additional documentation (that is new and substantial) to support your request, we recommend that you submit a Reconsideration.

**Please keep the following in mind:**

- The review cycle for of Reconsideration and Appeal requests may take up to 30 days. If you receive an incomplete on an Initial Application, the review cycle may take up to 60 days.

- All deadlines, fees, and registration policies remain in effect.

- As a reminder, your Reconsideration or Appeal request must be approved no less than 15 days prior to your desired exam date to schedule an exam appointment with any newly approved accommodations. Please note, approval of accommodations does not guarantee availability of all accommodations for your preferred test date and location.

If you or your evaluator have any questions regarding our review process, please contact us at accommodations@aamc.org.

MCAT® is a program of the Association of American Medical Colleges

The Association of American Medical Colleges is committed to providing appropriate accommodations to individuals with disabilities as defined by relevant federal law.



# Stop-the-Clock Breaks

On test day, you will have direct control over your approved stop-the-clock breaks. Stop-the-clock breaks allow you to pause the exam timer during the content sections of the exam. The exam content will be hidden from view when you activate a break. More information on how to activate these breaks is included with this letter.

Below is a list of testing policies that apply to the use of stop-the-clock breaks. Please review these policies prior to test day and contact us if you have any questions or concerns.

• The example given in this document is meant to be illustrative. On test day, the system will reflect the specific stop-the-clock breaks included in your approval letter.

• Using a stop-the-clock break will pause the exam timer until you return to the exam or you reach the maximum break time specified in your approval letter. If you do not return to the exam before the maximum break time is reached, the exam will resume and the exam timer will start counting down.

• You are welcome to leave the testing room when using a stop-the-clock break. You may also remain at your assigned workstation, if you wish. If you decide to leave the testing room, you must check out with the Test Center Administrator; you will also need to check in when returning to the testing room. Make sure to leave adequate time for the check-in and check-out procedures.

• You may not continue to work when taking a stop-the-clock break. Doing so is a violation of exam policies.

MCAT® is a program of the Association of American Medical Colleges

The Association of American Medical Colleges is committed to providing appropriate accommodations to individuals with disabilities as defined by relevant federal law.

**AAMC**

Medical College
Admission Test®

• Stop-the-clock breaks are not approved for use in the Tutorial or Examinee Agreement. Using a break in one of these sections will deduct that break time from the remainder of your exam.

• All other test-day policies outlined in the MCAT® Essentials remain in effect, and you are responsible for knowing and following these policies. You can find the MCAT® Essentials at the following link: https://students-residents.aamc.org/mcatessentials.

## Stop-the-Clock Break Example

The specifics of this accommodation will vary depending on your individual approval and can be found in your accommodations approval letter from AAMC.

Clicking on "Pause Exam" during your exam will bring up the "Pause Exam" pop-up. The pop-up message will show the maximum time given for pauses, time used for pauses, and time remaining for pauses.  To pause your exam click the "Pause Exam" button in the pop-up window.  To continue your exam without using your pause exam time, click on the "Cancel" button.

MCAT® is a program of the Association of American Medical Colleges

The Association of American Medical Colleges is committed to providing appropriate accommodations to individuals with disabilities as defined by relevant federal law.



AAMC
Medical College
Admission Test®

---

**Medical College Admission Test - MCAT Candidate**

⏱ Time Remaining 29:33
🖥 31 of 59

🗎 Calculator                                                        🔒 Pause Exam  ⚑ Flag for Review

**A Tale** | **Ipsum**

It was the best of times, it was the worst of times, it was the age of wisdom, it was the age of foolishness, it was the epoch of belief, it was the epoch of incredulity, it was the season of Light, it was the season of Darkness, it was the spring of hope, it was the winter of despair, we had everything before us, we had nothing before us, we were all going direct to Heaven, we were all going direct the other way - in short, the period was so far like the present period, that some of its noisiest authorities insisted on its being received, for good or for evil, in the superlative degree of comparison only.

In 1775, a man flags down the nightly mail-co
Dover. The man is Jerry Cruncher, an employee o
carries a message for Jarvis Lorry, a passenger an
Mr. Lorry sends Jerry back to deliver a cryptic resp
Life." The message refers to Alexandre Manette, a
released from the Bastille after an 18-year impriso
in Dover, he meets with Dr. Manette's daughter Lu
Pross. Lucie has believed her father to be dead, an
alive; Mr. Lorry takes her to France to reunite with

In the Paris neighbourhood of Saint Antoine, D
lodgings by his former servant Ernest Defarge and
wine shop. Mr. Lorry and Lucie find him in a smal
of his time making shoes - a skill he learned in pri
himself from his thoughts, and which has become
not recognise Lucie at first but does eventually se
through her blue eyes and long golden hair, a stra
sleeve when he was imprisoned. Mr. Lorry and Lucie take him back to England.

In 1780, French émigré Charles Darnay is on trial for treason against the British Crown. The key witnesses against him are two British spies, John Barsad and Roger Cly, who claim that Darnay gave information about British troops in North America to the French. Barsad states that he would recognise Darnay anywhere, at which point Darnay's defense counsel, Stryver, directs attention to Sydney Carton, a barrister present in the courtroom who looks almost identical to him. With Barsad's eyewitness testimony now discredited, Darnay is acquitted.

○ A.

○ B.

○ C.

○ D.

**Pause Exam** ☒

ⓘ Are you sure you want to pause this exam?

Maximum time given for pauses:
60:00

Time used for pauses:
00:00

Time remaining for pauses:
60:00

[Pause Exam] [Cancel]

⊘ Help                                              ⚙ Navigator   Next →

---

You may pause the clock and sit quietly in your seat, or you may pause the clock utilizing your stop-the-clock time to take an unscheduled break and leave the testing room. To take an unscheduled break and leave the testing room while the exam is paused, raise your hand. The test administrator will place your

MCAT® is a program of the Association of American Medical Colleges

The Association of American Medical Colleges is committed to providing appropriate accommodations to individuals with disabilities as defined by relevant federal law.



AAMC
| Medical College
| Admission Test®

exam in unscheduled break mode, and you will be required to follow standard check-out and check-in procedures.

While your clock is paused, you will see the following screen showing the maximum time given for pauses and time used for pauses. Time paused beyond the maximum may be deducted from your current exam section time. When you are ready to resume your exam, click on the "Resume Exam" button.

| Medical College Admission Test - MCAT Candidate | ⏱ Time Remaining 28:56 |
| --- | --- |
| | 📄 1 of 3 |

Your exam is paused

Maximum time given for pauses:
60:00

Time used for pauses:
00:10

Time paused beyond maximum may be deducted from current section time

[Resume Exam]

MCAT® is a program of the Association of American Medical Colleges

The Association of American Medical Colleges is committed to providing appropriate accommodations to individuals with disabilities as defined by relevant federal law.

Exhibit 2

AF - Page 1

## AAMC – MCAT ACCOMMODATION ANALYSIS

### Confidential Applicant Data

| | |
|---|---|
| Applicant: | AF |
| Age: | 22 |
| Dx(s): | ADHD – Combined |
| | Other Neurodevelopmental Disorder (d/t deficits in executive function and working memory) |
| | Anxiety Disorder (not specified) |
| | Depressive Disorder (not specified) |
| Type: | Re-Reconsideration |
| Request(s): | 150% ET |
| | |
| Date Received: | 04-26-23 |
| Date Returned: | 05-03-23 |
| Time Spent: | 5.0 |

Documents reviewed include all materials posted to AAMC's reviewer's website.

**Overview:** AF is a high functioning 22-year-old MCAT applicant whose first lifetime diagnosis of ADHD-Combined was made just recently after undergoing an evaluation by Dr. Benninger, an evaluator who self-identifies as a specialist in ADHD.  AF and others describe the presence of longstanding difficulties with time management, attentional focus, impulsivity, procrastination, absent-mindedness, and inefficient reading with the need to re-read repeatedly to ensure comprehension.  She has been prescribed the stimulant agent Concerta and more recently Adzenys XR-ODT (dosage unknown), which she reports taking daily.  AF had previously been diagnosed with Generalized Anxiety Disorder in 2017 in her high school years by her pediatrician Dr. Costlow, when signs of mounting difficulties in managing the pressures of her schoolwork emerged.  She was prescribed an unknown psychotropic agent at that time and currently takes Zoloft (dosage unknown.)  Additional details regarding her current anti-anxiety and anti-ADHD regimens including their efficacy and side effects have not been disclosed by the applicant, her parents, or Ms. Campbell, her current prescribing QP.  It is not known if she has previously or currently undergone any form of counseling or psychotherapy. There is no indication that she has ever been hospitalized for psychiatric reasons.

AF first secured formal academic accommodations at Duke University (150%, no penalty break time) on the basis of Dr. Costlow's diagnosis of an anxiety disorder. Her accommodations apparently were initiated one week before the end of classes in the Spring of 2021 semester. AF previously had never been accommodated or formally identified as a student with academic functional limitations or learning differences though she did reportedly receive school-based reading support as well as informal accommodations in her years at her private school.  No documentation from that school has been submitted for review. Additionally, AF has never received accommodation on the SAT, ACT or multiple AP examinations.  Her initial request to AAMC for 200%ET was rejected and she was offered EB time.  She requested reconsideration and was granted access to a separate room, but no ET.  She is now requesting re-reconsideration for 150%ET. Additional information has been provided in a letter from her physician father, a letter from her mother,  a revised PS, an addendum to the assessment from Dr. Benninger along with supportive letters from Dr. Costlow.

English is AF's primary language and there is no early history of multi-lingual exposure.  There is no apparent history of sociocultural deprivation or inadequate access to medical or educational resources. There is a reported family history of ADHD in two siblings.

**Analysis:** The bulk of the evidence for AF's reading, attentional and test-taking difficulties appear to be subjective and anecdotal in nature. While it is entirely plausible that her reading focus and efficiency have lagged behind her other academic skills presumably due to vulnerabilities in attention along with the interfering effects of performance anxiety, the key issue at present is whether such relative weaknesses cross the threshold of objective impairment. AF's prior ACT Reading subtest scores of 22 (60%ile) and 21 (54%ile) in 02-18 and 04-18 respectively, were at a level of performance in the mid average range compared to the overall test-taking population. Moreover, the English sub-sections of those tests - which also required the examinee to read passages and essays – were among her strongest scores (35/99%ile and 32/93%ile, respectively).

Inspection of the submitted high school and college transcripts reveals her to be a stellar student with A-level grades from 9-12th with the lone exception of a single B+ in AP English. Furthermore, AF performed well enough on her AP examinations to obtain college level credit for four courses without benefit of accommodation. At Duke University, she achieved straights A's in the three terms (including summer) prior to the receipt of accommodations.

Taken together, a review of her prior standardized test results and her academic track record academic grades do not paint a picture of marked impairment. Indeed, she has consistently performed in a stellar fashion in spite of her mood, attentional and reading challenges.

In the opinion of the undersigned, the results of the recent objective psychometric assessment -- which was apparently undertaken in support of her first request for reconsideration – provide weak support for the presence of substantial functional limitation and her request for time-and-a-half. This assessment was carried out in an idiosyncratic manner and its underlying data provide only limited support for the conclusions derived therefrom. I find myriad problematic aspects to Dr. Benninger's assessment, including:

- Uncertainty regarding AF's medication status. She was reportedly not taking her stimulant medication on the day(s) of testing. There was no mention of how this discontinuation was effectuated, and no discussion of this might have impacted the resulting scores. It was also not stated if she was taking her anti-anxiety medication on the day(s) of testing with no discussion of any possible ensuing impact on the results (e.g., sedation, mitigation of performance anxiety).
- No stand-alone validity tests were performed as part of the battery, departing from a widely recommended professional practice.
- Only one IQ subtest was administered (WAIS-IV Vocabulary), and the very high obtained score (ss=16,SS=130) was then utilized as the sole reference point for judging discrepancy and dysfunction. This practice could have had the effect of magnifying any resulting discrepancy.
- No performance tests of executive function, memory, processing speed or motor function were administered, as is typical in a work-up for ADHD. Yet multiple redundant self/other report measure of ADHD symptomatic were administered without any explanation for this practice.
- Limited achievement tests were administered: the GORT-5 oral reading battery -- which has an uncertain correlation to one's ability to read and respond silently to written text; and just one measure of untimed cloze reading, the WJ-IV Achievement Series Passage Comprehension subtest. Score on these, her two weakest measures, fell in the low average range (SS=90). No tests of timed word, sentence or paragraph reading, or math fluency - which are all relevant to the demands of the MCAT -- were given.
- Only limited tests of attention were performed: WAIS-IV digit "recall" (span) and S-B-5 Memory for Sentences. AF's scores were on the border between low average and average (SS=90) on both measures and moreover, these auditory attention tasks have marginal relevance to her ability to attend to unspoken MCAT items. No continuous performance test (CPT) - considered by some as the "gold standard" for documenting impaired attentional performance – was

administered.
- There was no history provided or discussion of the developmental gradient of AF's childhood ADHD manifestations – which are crucial for making the retrospective diagnosis of ADHD. No educational history was provided. The phrase "no induced factors" in the report was used without any explanation as to its meaning.
- There was no enumeration of DSM-5 Hyperactive ADHD criteria in order to support the conclusion that AF manifests the "Combined" subtype of this entity.
- There was minimal assessment of AF's current mood (limited to the subscales of the SCL-90-R) despite the presence of an ongoing mood disorder. Moreover, the SCL-90-R results (based on an unstated normative group) were actually negative for anxiety and only marginally elevated for depression.
- The Addendum letter does not include scores for the BRIEF Inconsistency and Negativity, two relevant validity scales.
- Dr. Benninger appears to base his characterization of "moderately severe" or "severe" ADHD on AF's self-report ratings whereas the parent-report ratings generally paint a more benign picture.
- The discussion of the discrepancy between the untimed Passage Comprehension and the timed GORT-5 Comprehension lacks substance as the scores differ by only an approximate one-third of a standard deviation.

The applicant and her parents attempt to account for the absence of a childhood neurodevelopmental diagnosis but it seems fairly implausible that AF could have manifested moderately severe core aspects of combined ADHD in childhood that were ignored by a supportive and informed family that was already familiar with the syndrome (via the diagnosis in other siblings). Dr. Costlow's argument that AF's anxiety - which was only formally diagnosed 2017 - effectively masked the symptoms of ADHD does not speak to the absence of early detection, as ADHD symptoms, especially those involving self-regulation, are typically most flagrant in the early years of development due to the immaturity of the central nervous system. Lastly, the multiple descriptions of AFs' admirable traits of discipline, attentional stamina and perseverance -- noted repeatedly in her PS and in the letters of her parents -- are at odds with the conclusion that she is severely impaired by dysexecutive aspects of ADHD.

**Conclusions**:  AF appears to be a high functioning young woman with manifestations of ADHD that were mild enough to 1) evade detection until late adolescence and 2) allow her to compensate effectively in the academic realm. Her educational history offers no hint of underachievement. Her strong drive to excel and her focus on performance have may indeed played a causal role in triggering her elevated levels of anxiety which have been duly diagnosed, treated and apparently well controlled.

Based on the sum total of data provided I would recommend granting this applicant 125%ET on the basis of the combined effects of anxiety and reading inefficiency leading to mild levels of functional impairment. Additionally, stop-the-clock breaks can afford her the opportunity to manage her stress level if she experiences a flare up of anxiety during testing. Access to a separate room will help screen her from ambient distractions and from becoming focused on other test-takers' activities.

In the judgment of the undersigned, the psychometric, educational, and clinical data do not establish a level of functional impairment that would warrant the provision of time-and-a-half.

**Recommendations**: Modify AF's re-reconsideration request and offer 125% ET along with endorsing the two previously granted accommodations, with the goal of helping this applicant better manage her attentional resources and emotions while sitting for the MCAT.

AF - Page 4

Respectfully submitted,

Mark S. Greenberg, Ph.D.
Consultant to AAMC

Exhibit E

## IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| A.F., | : | CASE NO.: 2:23-cv-01241 |
| | : | |
| Plaintiff, | : | JUDGE SARGUS |
| | : | |
| vs. | : | MAGISTRATE JUDGE |
| | : | |
| ASSOCIATION OF AMERICAN | : | |
| MEDICAL COLLEGES | : | |
| | : | |
| Defendants. | : | |

### DECLARATION OF WILLIAM BENNINGER, PH.D.

I, William Benninger, declare the following under penalty of perjury:

1.  I am over 18 years of age and otherwise competent to make this declaration. I have personal knowledge of the facts stated in this declaration.

2.  I had the opportunity to review the report of Dr. Mark Greenberg, Ph.D. Attached hereto as Exhibit 1 is a true and accurate copy of my response to Dr. Greenberg's report. All opinions and comments set forth in Exhibit 1 are based upon my education, experience, and training, as well as my evaluation and testing of A.F. and stated to a reasonable degree of medical certainty

3.  Based upon my education, experience, and training, as well as my evaluation and testing of A.F., I can reasonably state to a degree of medical certainty A.F. must be provided the 50% "extra time" accommodation due to her disability referenced above, not 25% as approved by AAMC.

4.  I will reiterate, A.F.'s academic success and success outside of school have no bearing on her need for the "extra time" accommodation.

I declare under penalty of perjury that the foregoing is true and correct.

William Benninger

Exhibit 1

# ADHD Specialists of Columbus
*Specializing in the Diagnosis and Treatment of ADHD*
*Children, Adolescents and Adults*
William B. Benninger, Ph.D.
Tara L. Benninger, Ph.D.
130 B Northwoods Blvd., Columbus, Ohio 43235
phone (614) 888-2343 (ADHD) • fax (614) 846-1849

June 3, 2023

Response to AAMC-MCAT Accommodation Analysis dated 05/03/2023 Re: ██████████
(DOB: 04/04/2001).

█████████████ completed a psychological evaluation in January 2023. As a result of this evaluation, she was diagnosed with ADHD-Combined Presentation (314.01) and Other Specified Neurodevelopmental Disorder (315.8) including Working Memory and Other Executive Function Impairments. She had been previously diagnosed (by a different practitioner) with a depressive disorder and anxiety disorder which also contribute to impairment.

The following is a response to a variety of opinions and conclusions drawn by the consultant to AAMC.

In the Analysis section is indicated; "the bulk of the evidence for AF's reading, attentional and test taking difficulties appear to be subjective and anecdotal in nature" (however later in the same section this consultant refers to the testing as an "objective psychometric assessment"). Since this is the primary way that ADHD is diagnosed this statement, that implies a lack of scientific rigor to the report, is misleading. This consultant may be implying that a more thorough neuropsychological evaluation involving many "objective" tests is needed; however, the literature on the diagnosis of ADHD by the leading experts in the field clearly indicate that neuropsychological testing is "over testing" and unnecessarily lengthy and expensive not to mention, not adding any accuracy to the conclusions. It certainly would be nice if objective testing was sufficiently valid and reliable to diagnose ADHD but to date, this is not the case. There is no objective "test" that is sufficiently valid and reliable to diagnose ADHD (which, of course, is the case for all psychiatric impairments).

Later, in the beginning of this analysis section, the consultant indicates "taken together, a review of her prior standardized test results and her academic track record academic grades (sic) do not paint a picture of marked impairment. Indeed, she has consistently performed in a stellar fashion in spite of her mood, attentional and reading challenges." This statement is a common error generated by individuals who do not understand the significant difficulties created by ADHD symptoms and their effect on academics. While AF did produce excellent overall results the process in which this was achieved was much different than typical individuals (those without ADHD). As was indicated in the narrative section of the original report, AF exhibited significant

difficulties with "all phases of homework completion in high school and college." More specifically, she exhibited severe difficulty in both high school and college with knowing what her assignments were, having the needed materials, and sustaining her efforts through completion. She exhibited moderate/severe difficulty with getting started on homework without procrastinating and turning in completed work in a timely manner. In addition, she exhibited severe difficulty in persisting with uninteresting work, had significant difficulty with completing long-term projects (due to procrastination, difficulties with planning and organizing material and feeling overwhelmed), and significant time judgment difficulties (often being late, misjudging time and losing track of time). AF succeeded because of her remarkable persistence over time and her drive to complete the important academic tasks in her life in spite of the multiple and significant roadblocks presented by the ADHD symptoms. Unfortunately, in a timed testing situation (such as the MCAT) the luxury of being on and off task, having difficulty persisting, having difficulty focusing, having impaired time judgment, and having difficulty with uninteresting material does not afford one the luxury of these difficulties. Given her qualities of task persistence and her high verbal IQ she was able to succeed in spite of these difficulties. AF had to work much longer and harder (issues that cannot be measured by objective testing) in order to succeed. In terms of the MCAT, without accommodations of extended time the "working much longer" part that she was able to do on her own time to maximize academic achievement is not possible.

To address a few other bullet points in this consultant's "analysis":

1. "No stand-alone validity tests were performed as a part of the battery, departing from a widely recommended professional practice". This consultant may be referring, again, to neuropsychological testing that is actually **not** a "widely recommended professional practice" for the diagnosis of ADHD. It is actually discouraged by the foremost experts in the field as a waste of time and resources (I do acknowledge; however, that some still do neuropsychological testing for the diagnosis of ADHD, in spite of evidence of its value to the contrary). However, multiple standardized objective tests (with acceptable levels of validity and reliability) were used in the initial evaluation. In addition, multiple self, and observer report rating scales also with acceptable levels of validity and reliability were used as well.

2. "Only one IQ subtest was administered (WAIS-IV Vocabulary), and the very high obtained score (ss = 16, SS = 130) was then utilized as the sole reference point for judging discrepancy and dysfunction. This practice could have had the effect of magnifying any resulting discrepancy." A full IQ test is considered "over testing" for an ADHD evaluation. Since the verbal IQ is most relevant for the accommodations requested, and because the Vocabulary subtest has a .86 correlation with the overall Verbal IQ score (when the whole verbal IQ section is administered) it is considered to be a reliable screening measure.

3. "No performance tests of executive function, memory, processing speed or motor function were administered, as is typical in a workup for ADHD". Again, this individual continues to refer to testing that would be typically performed in a neuropsychological test battery which (as indicated above) is *not* recommended by the foremost experts in the field. In this same section, "yet multiple redundant self/other report measures of ADHD symptomatic (sic) were administered without any explanation for this practice." Those sufficiently familiar with ADHD

rating scales (while knowing they are a very important and necessary component to an evaluation, in part, because they provide very important and necessary ecological validity) also know that the validity of any one scale by itself is only 50-60% accurate and therefore multiple scales must be utilized in order to provide the necessary converging lines of evidence for them to be sufficiently reliable. Unfortunately, most individuals that complete ADHD evaluations only use one rating scale which significantly impairs accuracy.

4. "No continuous performance test (CPT)-considered by some as the "gold standard" for documenting impaired attentional performance was administered." Unfortunately, this consultant seems unaware that a CPT is far from considered to be the "gold standard" by those highly familiar with the reliability and validity of these tests. Fifty percent of individuals with ADHD can pass a CPT (no better than a coin flip) and although 90% of individuals who do not pass a CPT are considered to have significant attentional difficulties the origin of these difficulties is unknown and could be due to depression, anxiety, schizophrenia, or many other disorders and therefore is not sufficiently conclusive regarding an ADHD evaluation. Again, while many do use a CPT, most often they are insufficiently aware (or just ignore) the statistical data on these instruments.

5. "There was no history provided or discussion of the developmental gradient of AF's childhood ADHD manifestations-which are crucial for making the retrospective diagnosis of ADHD." Since this individual exhibits a very high verbal IQ, it is common in early childhood for ADHD symptoms (particularly when considering academic grades/performance) to be significantly masked so that observers (such as teachers) may be unaware of the struggles of any individual child. By high school; however, struggles are much more obvious and are most reliably determined by difficulties in homework completion (previously addressed) and not grades. Also questioned in the consultant's evaluation -"the phrase 'no induced factors' in the report was used without any explanation as to its meaning." While irrelevant to the requests made, "no induced factors" means exactly that. That for AF, common factors that could induce ADHD (e.g., mothers' that smoke and drink during pregnancy, fetal distress during birth, prematurity, low birth weight, multiple or severe head injuries, etc.) were not present. In AF's case the inheritable factors were overwhelmingly present with a sister, brother, cousin, and uncle all of whom are diagnosed with ADHD and a father with similar symptoms.

6. "There is no enumeration of DSM-5 Hyperactive ADHD criteria in order to support the conclusion that AF manifests the 'Combined' subtype of this entity." While this impairment was clearly documented in the self and observer report results and it was clearly indicated that AF meets symptom count criteria, no accommodation requests were based on these symptoms so elaboration was unnecessary.

7. "Dr Benninger appears to base his characterization of 'moderately severe' or 'severe' ADHD on AF's self-report ratings whereas, the parent-report ratings generally paint a more benign picture." I'm not sure what this statement was based on as three out of the four Inattention rating scales completed by the Observer (parent) showed marked/severe or moderate impairment.

This consultant tries to dismiss and/or discount even the possibility that this individual has ADHD. ("The applicant and her parents attempt to account for the absence of a childhood

neurodevelopmental diagnosis but it seems fairly implausible that AF could have manifested moderately severe core aspects of combined ADHD in childhood that were ignored by a supportive and informed family that was already familiar with the syndrome"). Frankly, it is surprising that this consultant tries to dismiss even the possibility that ADHD exists, (based on the data provided), with this individual, yet increases the accommodations previously provided by AAMC. This consultant also indicates; "lastly, the multiple descriptions of AF's admirable traits of discipline, attentional stamina and perseverance… are at odds with the conclusion that she is severely impaired by dysexecutive aspects of ADHD." First, it's been clearly indicated and documented that her "attentional stamina" is severely impaired. In terms of her "admirable traits of discipline… and perseverance," I would certainly agree that these are highly admirable traits and it's very fortunate that all individuals do not manifest all of the possible symptoms of the disorder and very fortunately for AF, her traits of discipline and perseverance were actually sufficient (in the big picture throughout high school and college) to compensate for the moderate/severe ADHD symptoms so as to allow her to be successful. Unfortunately, these traits will not sufficiently compensate for the demands of the (MCAT) tests in question.

The consultant concludes; "in the judgment of the undersigned, the psychometric, educational, and clinical data do not establish a level of functional impairment that would warrant the provision of time-and-a-half." I respectfully disagree with this conclusion. The test results, clinical information, and functional impairment documented in the initial report are actually quite a classic representation of a very bright individual that suffers from clinically significant levels of ADHD symptoms. She was able to manage these moderate to severe symptoms *in her daily academic life* by spending **much** extra effort **and time** to compensate for the impairments they created.  Unfortunately, this is an often-overlooked burden that almost all individuals with ADHD have to bear and that even many experts in the field are blind to. Providing the requested (150%) extra time on a standardized test would level the playing field for her, so that she would be able to show what she knows.

William B. Benninger, Ph.D., Psychologist
Specializing in the Diagnosis and Treatment of ADHD
Former Adjunct Assistant Professor, The Ohio State University
PsyPact Interjurisdictional Approved Provider
Co-Founder ADDvisor.com