# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

A.F.,

|                |                                          |
|----------------|------------------------------------------|
| **Plaintiff,** | **Case No. 2:23-cv-1241**                |
|                | **JUDGE EDMUND A. SARGUS, JR.**          |
| **v.**         | **Magistrate Judge Elizabeth P. Deavers** |

ASSOCIATION OF AMERICAN
MEDICAL COLLEGES.,

      **Defendant.**

## OPINION AND ORDER

This matter is before the Court on Plaintiff A.F.'s Motion for Temporary Restraining Order and/or Preliminary Injunction ("Motion"). (ECF No. 4.) Defendant Association of American Medical Colleges ("AAMC") opposes Plaintiff's Motion. (ECF Nos. 13, 27.) For the reasons set forth below, the Court **DENIES** Plaintiff's Motion.

## I.  BACKGROUND

Plaintiff brings this action against AAMC alleging, *inter alia*, violations of Title III of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.* Plaintiff alleges she is a person with a disability under the ADA and is entitled to 50% extra testing time on the Medical College Admission Test ("MCAT") given her diagnosed cognitive disorders, such as Attention Deficit Hyperactivity Disorder ("ADHD") and anxiety. AAMC disagrees, asserting that Plaintiff is not disabled within the meaning of the ADA, and therefore she is not entitled to her requested time-and-a-half accommodation on the MCAT. In response to AAMC's denial of her requested accommodation, Plaintiff filed the instant lawsuit. While the parties contest the propriety of Plaintiff's requested testing accommodation, the underlying facts are largely undisputed.

1

**A. The Parties**

At the time of filing her Complaint, Plaintiff was a student at Duke University with the expectation that she would graduate in the spring of 2023. (Compl. ¶ 14, ECF No. 4.) Following her graduation, Plaintiff plans to enroll in medical school. (*Id.*) She is eligible to take the MCAT, *id.* ¶ 3, and she is scheduled to do so in late June 2023.

Defendant AAMC is a not-for-profit membership association that develops and administers the MCAT—a standardized, multiple-choice examination that aids medical school admissions offices in their evaluations of medical school applicants. (Bugbee Decl. ¶¶ 2-3, ECF No. 12-1.) AAMC's members consist of 170 accredited U.S. and Canadian medical schools, more than 400 teaching hospitals and health systems, and more than 70 faculty and academic societies. (*Id.* ¶ 2.) AAMC reviews and processes thousands of accommodations requests each year, granting most requests in whole or in part. (*Id.* ¶ 12.)

**B. The Medical College Admission Test**

The MCAT is a standardized, multiple-choice examination created to help medical school admissions offices assess an applicant's problem solving, critical thinking, and knowledge of natural, behavioral, and social science concepts and principles that serve as key prerequisites to the study of medicine. (*Id.* ¶ 3.) This computer-based examination consists of four multiple-choice sections: (a) Chemical and Physical Foundations of Biological Systems; (b) Biological and Biochemical Foundations of Living Systems; (c) Psychological, Social, and Biological Foundations of Behavior; and (d) Critical Analysis and Reasoning Skills. (*Id.* ¶ 4.) When administered under standard testing conditions, the MCAT lasts just over seven hours, of which six hours account for actual testing time. (*Id.*)

AAMC does provide testing accommodations on the MCAT for qualifying examinees, with the stated goal of providing "a valid exam while maintaining a level playing field for all test takers." (*Id.* ¶ 11.) As a precondition to receiving a testing accommodation, an examinee generally must have a documented disability, as defined under the ADA, that requires an accommodation to access the examination. (*Id.* ¶¶ 9, 10.)

The AAMC individually reviews all requests for testing accommodations. (*Id.* ¶ 10.) The review process typically involves one or more doctoral-level psychologists or medical professionals who evaluate the appropriateness of the request. (*Id.* ¶ 14.) In addition, some requests undergo another level of review by external professionals with expertise in the examinee's relevant impairment. (*Id.*) Of course, AAMC does not grant every request for testing accommodations. (*Id.* ¶ 13.) Indeed, AAMC denies such requests when an examinee's application fails to demonstrate that the examinee has a disability within the meaning of the ADA, as interpreted by AAMC, or fails to demonstrate that a particular accommodation is reasonable or necessary to take the MCAT in an accessible manner. (*Id.*) AAMC also may offer accommodations different from those requested by the examinee when AAMC deems it appropriate (*i.e.*, where the examinee's functional limitations warrant some accommodation different in kind or degree to the accommodation requested). (*Id.*)

### C. Plaintiff's Educational History

Plaintiff attended the Columbus School for Girls ("CSG") from 2004 to 2019. (Ex. 3 to Def.'s Opp'n, ECF No. 12-3.) Beginning in high school, CSG provided Plaintiff with formal and informal testing accommodations, including extra testing time, due to Plaintiff's cognitive disabilities. (Pl. Decl. ¶ 4, ECF No. 19-1.) While in high school at CSG, Plaintiff received all A's except for a single B+ in an Advanced Placement ("AP") English & Composition class. (Bugbee

Decl. ¶ 17, ECF No. 12-1.) Eight of her courses were AP courses, and she took multiple honors courses as well. (*Id.*) She also received recognition for her scholastic achievements: she was the Outstanding Physics Student of the Year in both 2017 and 2018, she earned the BC Stott Award in AP Calculus in 2018, and the Science Cup in 2019. (*Id.*) Plaintiff graduated from CSG with a cumulative Grade Point Average of 3.99. (*Id.*)

Plaintiff does have prior experience taking standardized tests. During her junior year at CSG, Plaintiff took the American College Test ("ACT") twice. (*Id.* ¶ 20.) Plaintiff scored a composite score of 28 on her first attempt, and 30 on her second try, placing her in the 89th and 94th percentiles, respectively. (*Id.* ¶ 20; *see also National Distributions of Cumulative Precents for ACT Test Scores ACT-Tested High School Graduates from 2015, 2016 and 2017*, ACT, INC., www.act.org/content/dam/act/unsecured/documents/MultipleChoiceStemComposite2017-18.pdf (last visited June 10, 2023).) She earned her highest subject scores in English and Math, where she placed in the 99th percentile, and her lowest subject score was in reading, where she placed in the 54th percentile. (Bugbee Decl. ¶ 20, ECF No. 12-1.) Plaintiff also took the SAT twice. (Ex. D to French Decl., ECF No. 26-3.) Her best SAT score was 1500, which placed her in the top 2% of examinees. (*Id.*; *see also* AAMC's Supp. Brief at 7, ECF No. 27.) Plaintiff completed these exams without accommodations. (*See* Ex. I to Bugbee Decl., ECF No. 12-1; Ex. I to French Decl., ECF No. 26-3.)

Her academic success continued into adulthood. Upon graduating from CSG, Plaintiff enrolled at Duke University, majoring in Psychology and minoring in Chemistry. (Compl. ¶ 14, ECF No. 3; Ex. G to Bugbee Decl., ECF No. 12-1.) With no formal accommodations, Plaintiff achieved straights A's both semesters of her first year and straight A's in the fall semester of her second year. (Ex. G to Bugbee Decl., ECF No. 12-1.) In April 2021, during the spring semester of

her second year, Duke University permitted Plaintiff to receive 50% extra time on her classroom tests and extra break time due to her "documented disability." (*Id.*; Ex. E to Bugbee Decl., ECF No. 12-1.) While the record is unclear whether Plaintiff ultimately used these accommodations, the record does establish that Plaintiff continued to earn straight A's, resulting in a cumulative Grade Point Average of 3.99 as of the fall semester of her final academic year. (Ex. G to Bugbee Decl., ECF No. 12-1.)

### D. Plaintiff's Requests for Testing Accommodations

On January 14, 2023, Plaintiff submitted her request for 50% extra testing time on the MCAT. (Pl. Decl. ¶ 7, ECF No. 19-1; Bugbee Decl. ¶ 15, ECF No. 12-1; Ex. A. to Bugbee Decl., ECF No. 12-1.) In support of her request, Plaintiff provided a personal statement explaining her request for testing accommodations, two letters from a physician's assistant to Dr. Mina Bozak, and a Professor Accommodation Letter from Duke University. (Pl. Decl. ¶ 7, ECF No. 19-1; Bugbee Decl. ¶ 16, ECF No. 12-1.) And upon AAMC's request, Plaintiff also provided copies of her high school and college transcripts. (Bugbee Decl. ¶ 16, ECF No. 12-1.)

Plaintiff's personal statement detailed her lifelong struggles to process and retain information in academic settings, even after she began taking medication for her conditions. (*See* Ex. B to Bugbee Decl., ECF No. 12-1.) Plaintiff described how she "never finished standardized tests on time and that these scores never reflected [her] academic success," citing her difficulties reading "the words on the page while attempting to process a million other stimuli at the same time." (*Id.*) Due to her difficulties, Plaintiff "never finished sections on time, especially sections like the reading and science sections on the ACT, which primarily included passage-based questions." (*Id.*) Plaintiff's personal statement also noted how she was diagnosed with anxiety disorder in high school, and more recently with ADHD. (*Id.*) But after receiving testing

accommodations, Plaintiff stated that her testing experience mirrored those of test takers testing under standard conditions—that is, when her peers finished their tests on time, so, too, would Plaintiff; when her peers struggled to complete the final problems on a test, Plaintiff would struggle as well. (*Id.*)

The letters submitted by Dr. Mina Bozak's Physician's Assistant, Pamela Campbell, described Ms. Campbell's clinical evaluation of Plaintiff in October 2022. (*See* Exs. C, D to Bugbee Decl., ECF No. 12-1.) Ms. Campbell's evaluation resulted in a "strong diagnostic impression that [Plaintiff's] history is highly consistent with ADHD, combined type," as well as "Generalized Anxiety Disorder." (Ex. C to Bugbee Decl., ECF No. 12-1.) Ms. Campbell concluded her November 14, 2022 letter by recommending that Plaintiff receive 100% extra testing time on the MCAT. (*Id.*) Dr. Bozak reviewed and adopted the November 14, 2022 letter. (*See id.*; Pl. Decl. ¶ 7, ECF No. 19-1.)

On March 1, 2023, AAMC notified Plaintiff that it had approved the accommodation of stop-the-clock breaks but had denied Plaintiff's request for extra testing time. (Ex. H to Bugbee Decl., ECF No. 12-1.) In denying Plaintiff's accommodations request, AAMC stated:

> You requested 50% extended time on the basis of ADHD and a psychiatric impairment. Your records document the diagnoses of ADHD and generalized anxiety disorder and support the need for time to manage symptoms on test day. To that end, we have approved additional time for breaks (i.e., stop the clock breaks) to provide opportunities for you to refresh your attentional resources, manage anxiety, regroup, and refocus without taking time away from test taking. There is not sufficient evidence, or data (based on objective assessment), to support the need for more time to access and/or process the actual test content as would be consistent with the accommodation of extended testing time. We additionally note that documentation of performance on prior standardized testing was not submitted for review.

(*Id.*)

Three days later, Plaintiff requested that AAMC reconsider its denial of her request for additional testing time. (Bugbee Decl. ¶ 20, ECF No. 12-1.) Accompanying Plaintiff's request for reconsideration were Plaintiff's ACT score reports, as well as two reports from William Benninger, Ph.D., a specialist in the diagnosis and treatment of ADHD in children, adolescents, and adults. (*Id.*; Benninger Decl. ¶ 3, ECF No. 19-2.) These reports followed from Dr. Benninger's evaluation of Plaintiff by way of two Zoom calls lasting approximately two hours each. (Ex. F to French Decl., ECF No. 26-3.)

In the first report, dated January 2023, Dr. Benninger diagnosed Plaintiff as having "ADHD Combined Presentation (314.01)." (Ex. K to Bugbee Decl., ECF No. 12-1.) As to the current severity of Plaintiff's ADHD, Dr. Benninger indicated it was "moderate." (*Id.*) In addition, Dr. Benninger's report listed Plaintiff's "Comorbid/Coexisting Disorders":

A. Other Specified Neurodevelopmental Disorder (315.8) Working Memory and Other Executive Function Impairments
B. Depressive Disorder (previously diagnosed)
C. Anxiety Disorder (previously diagnosed)

(*Id.*)

Dr. Benninger concluded his report with two recommendations: first, that Plaintiff receive 50% extra time on each section of the MCAT; and second, that Plaintiff test in a quiet, distraction free environment. (*Id.*)

Plaintiff also submitted Dr. Benninger's supplemental report, dated March 2023, in her request for reconsideration. (Ex. L to Bugbee Decl., ECF No. 12-1.) In this report, Dr. Benninger reiterated the results of the tests he administered to Plaintiff during her January 2023 examination, Plaintiff's diagnoses, and his recommended testing accommodations (*i.e.*, extended testing time and test taking in a distraction-free environment). (*Id.*) Dr. Benninger also opined that the already-granted stop-the-clock breaks were insufficient to fully compensate Plaintiff for her disability. (*Id.*)

AAMC reviewed Plaintiff's additional materials and, on March 31, 2023, notified Plaintiff of its decision to deny her request for 50% extra testing time. (Bugbee Decl. ¶ 25, ECF No. 12-1; Ex. P to Bugbee Decl., ECF No. 12-1.) Although AAMC denied Plaintiff's request for additional testing time, AAMC again approved her request for stop-the-clock breaks and granted Plaintiff permission to test in a "quiet, distraction-free environment." (Bugbee Decl. ¶ 25, ECF No. 12-1.) Prior to issuing its denial, AAMC consulted with two external professionals concerning Plaintiff's requested accommodations, Allyson G. Harrison, Ph.D., and Joseph Bernier, Ph.D. (*Id.* ¶ 22.) Both outside professionals had expertise in the areas of Plaintiff's claimed impairments, and both concluded that Plaintiff's documentation fell short of supporting her request for 50% extra time on the MCAT. (*Id.* ¶¶ 22-24.)

The first outside reviewer, Dr. Allyson G. Harrison, concluded that Plaintiff's submitted materials did not support "50% extra test-taking time." (Ex. N to Bugbee Decl., ECF No. 12-1.) In reaching this conclusion, Dr. Harrison opined that Dr. Benninger's evaluation of Plaintiff failed to demonstrate that Plaintiff was "substantially impaired in her ability to participate equally on the MCAT," citing (1) Dr. Benninger's examination of Plaintiff while she was not on medication (which makes it difficult for AAMC to determine how she will perform during the MCAT), (2) the tests Dr. Benninger administered during Plaintiff's evaluation show only a weak association with actual executive function problems in real-life, and (3) Plaintiff's self-reported ADHD symptoms are "minimally correlated with actual real-world functional impairment." (*Id.*) Dr. Harrison also reviewed Plaintiff's academic performance dating back to high school, noting that she "cannot see how [Plaintiff] has been impaired in her academic functioning or ability to participate equally on timed evaluations." (*Id.*) Dr. Harrison did, however, note that "[h]er conditions may require her to take stop-the-clock breaks in order to calm down, refresh her

attentional resources, manage her anxiety and hyperactivity, and employ learned strategies to cope with negative cognitions . . . ." (*Id.*)

The second outside reviewer, Joseph E. Bernier, Ph.D., likewise concluded that Plaintiff's documentations did not support her request for 50% extra testing time. (Ex. O to Bugbee Decl., ECF No. 12-1.) Dr. Bernier reviewed Plaintiff's academic performance over the course of her academic career, opining that "[t]he academic documents suggest that although she may have had to work harder than many of her peers to achieve the level of success reflected in the record, her mental disorders did not put her at a significant disadvantage as compared to the general public." (*Id.*) Dr. Bernier, like Dr. Harrison, also took issue with Dr. Benninger's evaluation of Plaintiff. Dr. Bernier did not consider Dr. Benninger's evaluation to be a "comprehensive assessment of cognitive performance." (*Id.*) According to Dr. Bernier, Dr. Benninger evaluated Plaintiff's cognitive performance through vocabulary and digit recall subtests and a memory for sentences subtest, which are single subtests that "generally provide poor construct coverage or measurement, and the interpretations, diagnoses, and predictions based on single subtests is questionable practice." (*Id.*) Furthermore, Dr. Bernier challenged Dr. Benninger's determination of Plaintiff's impaired functioning because Dr. Benninger relied "on the internal referent of the candidate herself rather than the external referent of the general population." (*Id.*) Dr. Bernier also noted that Plaintiff's scores on the reading tests that Dr. Benninger administered placed Plaintiff within the average range when compared to the general population. (*Id.*) Dr. Bernier concluded his report by endorsing "sixty minutes of stop the clock breaks as previously approved, and a low distraction test setting . . . ." (*Id.*)

Following AAMC's denial of Plaintiff's request for reconsideration, Plaintiff submitted additional documentation supporting her disability and her need for the 50% extra time

accommodation. (Goldstein Decl. ¶ 2, ECF No. 24.) These documents consisted of letters from her parents and her pediatrician, a revised personal statement, and a revised assessment from Dr. Benninger. (*See* Ex. 2, ECF No. 24.) Both Plaintiff's pediatrician, Dr. Costlow, and Dr. Benninger opined that Plaintiff was substantially limited when compared to the general population. (*See* Ex. 4 to Benninger Decl., ECF No. 19-2; Costlow Decl. ¶¶ 6-7, ECF No. 20-1.)

In light of Plaintiff's additional documentation, AAMC approved Plaintiff for 25% extra testing time on the MCAT. (Goldstein Decl. ¶ 3, ECF No. 24.) This approval process involved consultation with another external reviewer, Mark Greenberg, Ph.D. (Ex. 2, ECF No. 24.) Dr. Greenberg recommended 25% extra testing time along with the two previously granted accommodations, based on "the combined effects of anxiety and reading inefficiency leading to mild levels of functional impairment." (*Id.*) But in denying Plaintiff's request for 50% extra testing time, Dr. Greenberg identified "myriad problematic aspects to Dr. Benninger's assessment":

- No stand-alone validity tests were performed as part of the battery, departing from a widely recommended professional practice.

- Only one IQ subtest was administered (WAIS-IV Vocabulary), and the very high obtained score (ss=16,SS=130) was then utilized as the sole reference point for judging discrepancy and dysfunction. This practice could have had the effect of magnifying any resulting discrepancy.

- No performance tests of executive function, memory, processing speed or motor function were administered, as is typical in a work-up for ADHD. Yet multiple redundant self/other report measure of ADHD symptomatic were administered without any explanation for this practice.

- Limited achievement tests were administered: the GORT-5 oral reading battery -- which has an uncertain correlation to one's ability to read and respond silently to written text; and just one measure of untimed cloze reading, the WJ-IV Achievement Series Passage Comprehension subtest. Scores on these, her two weakest measures, fell in the low average range (SS=90). No tests of timed word, sentence or paragraph reading, or math fluency - which are all relevant to the demands of the MCAT -- were given.

\* \* \*

10

- No continuous performance test (CPT) - considered by some as the "gold standard" for documenting impaired attentional performance – was administered.

* * *

- There was no enumeration of DSM-5 Hyperactive ADHD criteria in order to support the conclusion that AF manifests the "Combined" subtype of this entity.

- There was minimal assessment of AF's current mood (limited to the subscales of the SCL-90-R) despite the presence of an ongoing mood disorder. Moreover, the SCL-90-R results (based on an unstated normative group) were actually negative for anxiety and only marginally elevated for depression

- The Addendum letter does not include scores for the BRIEF Inconsistency and Negativity, two relevant validity scales.

* * *

- The discussion of the discrepancy between the untimed Passage Comprehension and the timed GORT-5 Comprehension lacks substance as the scores differ by only an approximate one-third of a standard deviation.

(*Id.*)

After reviewing Dr. Greenberg's report, Dr. Benninger refuted Dr. Greenberg's conclusions and reiterated his opinion:

> The test results, clinical information, and functional impairment documented in the initial report are actually quite a classic representation of a very bright individual that suffers from clinically significant levels of ADHD symptoms. She was able to manage these moderate to severe symptoms *in her daily academic life* by spending **much** extra effort **and time** to compensate for the impairments they created. Unfortunately, this is an often-overlooked burden that almost all individuals with ADHD have to bear and that even many experts in the field are blind to. Providing the requested (150%) extra time on a standardized test would level the playing field for her, so that she would be able to show what she knows.

(Ex. 1, ECF No. 24.)

### E. Procedural History

On April 3, 2023, as a result of AAMC's repeated denials of Plaintiff's request for testing accommodations, Plaintiff commenced a state court action for injunctive, declaratory, and monetary relief against AAMC, based on its allegedly discriminatory conduct against Plaintiff, a person with an alleged disability. (*See* Not. of Removal, ECF No. 1.) Accompanying Plaintiff's Complaint was her Motion for Temporary Restraining Order and/or Preliminary Injunction. (*See* Compl. ECF No. 3; Mot., ECF No. 4.)

On April 7, 2023, AAMC removed the state court action to this Court, and the Court scheduled a temporary restraining order hearing for April 25, 2023. (Not. of Removal, ECF No. 1; April 10, 2023 Order, ECF No. 6.) On April 14, 2023, AAMC filed its response in opposition to Plaintiff's Motion. (ECF No. 13.) Four days later, Plaintiff moved to reschedule the temporary restraining order hearing for early June 2023, citing the need for additional time to provide AAMC with Plaintiff's additional documentation and to respond to AAMC's discovery. (ECF No. 14.) In addition, Plaintiff's motion indicated that she would not be irreparably harmed by delaying her testing date to late June. (*Id.*) The Court granted Plaintiff's motion to continue. (ECF No. 16.)

On May 5, 2021, Plaintiff filed her reply to AAMC's opposition. (ECF No. 21.) On May 31, 2023, following a telephone conference with the parties, the Court vacated the temporary restraining order hearing and authorized additional briefing on Plaintiff's Motion. (ECF No. 23.) The parties also agreed to forego a hearing on Plaintiff's Motion, instead opting for a decision based on their briefs.

On June 5, 2023, Plaintiff filed her supplemental brief. (ECF No. 24.) AAMC filed its supplemental brief in opposition on June 9, 2023. (ECF No. 27.) Plaintiff's Motion is fully briefed and ripe for review.

## II.     STANDARD

Rule 65 of the Federal Rules of Civil Procedure provides for injunctive relief when a party believes it will suffer immediate and irreparable injury, loss, or damage. Fed. R. Civ. P. 65. Still, an "injunction is an extraordinary remedy which should be granted only if the movant carries his or her burden of proving that the circumstances clearly demand it." *Overstreet v. Lexington-Fayette Urban Cnty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002). Moreover, when a party is seeking an order mandating affirmative action through the requested injunctive relief, as is the case here, "the burden is heightened." *Shah v. Fortive Corp.*, No. 1:22-cv-312, 2022 U.S. Dist. LEXIS 108953, at *7 (S.D. Ohio June 17, 2022) (citing *Shelby Cnty. Advocs. for Valid Elections v. Hargett*, 348 F. Supp. 3d 764, 769 (W.D. Tenn. 2018)).

In determining whether to issue a preliminary injunction, the Court must balance four factors: (1) whether the movant has shown a strong likelihood of success on the merits; (2) whether the movant will suffer irreparable harm if the injunction is not issued; (3) whether the issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuing the injunction. *Id*. (citing *Leary v. Daeschner*, 228 F.3d 729, 736 (6th Cir. 2000)). These four considerations are balancing factors, not prerequisites that must be met. *Id*. (citing *United Food & Com. Workers Union, Local 1099 v. Sw. Ohio Reg'l Transit Auth*., 163 F.3d 341, 347 (6th Cir. 1998)). "[A] district court is not required to make specific findings concerning each of the four factors used in determining a motion for preliminary injunction if fewer factors are dispositive of the issue." *Jones v. City of Monroe*, 341 F.3d 474, 476 (6th Cir. 2003), *abrogated on other gds. by Anderson v. City of Blue Ash*, 798 F.3d 338, 357 (6th Cir. 2015).

### III.    DISCUSSION

Plaintiff submits that all four factors weigh in favor of a preliminary injunction.

### A.  Likelihood of Success on the Merits

Plaintiff must first prove that her claims have a strong likelihood of success on the merits. While a plaintiff is not required to prove her entire case at this stage, "to establish success on the merits, a plaintiff must show 'more than a mere possibility of success.'" *Black v. Cincinnati Fin. Corp.*, No. 1:11-cv-2010, 2011 U.S. Dist. LEXIS 46852, at \*6 (S.D. Ohio May 2, 2011) (quoting *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 543 (6th Cir. 2007) (internal quotations omitted)). "Although no one factor is controlling, a finding that there is simply no likelihood of success on the merits is usually fatal." *Gonzales v. National Bd. of Med. Examiners*, 225 F.3d 620, 625 (6th Cir. 2000). "The Court's preliminary findings are not entitled to a preclusive effect in the event the case is tried to a fact-finder at a later date, at which time the ultimate fact-finder may reach a different conclusion." *Cabot Corp. v. King*, 790 F. Supp. 153, 156 (N.D. Ohio 1992) (internal citation omitted).

Plaintiff brings her claims under Title III of the ADA, alleging that AAMC violated the ADA by failing to provide Plaintiff with reasonable accommodations to take the MCAT. Title III of the ADA provides, in pertinent part, that an entity offering "examinations or courses related to applications, licensing, certification, or credentialing for secondary or post-secondary education, professional, or trade purposes shall offer such examinations or courses in a place and manner accessible to persons with disabilities or offer alternative accessible arrangements for such individuals." 42 U.S.C. § 12189. AAMC does not dispute that it falls under this provision of the ADA.

14

To show a violation of the ADA based on AAMC's failure to accommodate, Plaintiff must show (1) she is disabled, (2) her requests for accommodation are reasonable, and (3) that AAMC denied those requests. *See Berger v. Nat'l Bd. of Med. Examiners*, No. 1:19-cv-99, 2019 U.S. Dist. LEXIS 145666, at *55 (S.D. Ohio Aug. 27, 2019). AAMC contends that Plaintiff cannot satisfy the first two prongs, and therefore she cannot demonstrate a strong likelihood of success on the merits of her ADA claim. That is, AAMC asserts that (1) Plaintiff has failed to provide the Court with evidence showing she is disabled within the meaning of the ADA, and (2) even if Plaintiff is disabled under the ADA, she has failed to show that the accommodations AAMC approved were unreasonable. (AAMC's Opp'n at 18-25, ECF No. 13.) The Court begins with AAMC's first challenge.

### a. Whether Plaintiff Is "Disabled"

A person is disabled under the ADA if she has "a physical or mental impairment that substantially limits one or more major life activities . . . ." 42 U.S.C. § 12102 (1)(A). On January 1, 2009, the Americans with Disabilities Act Amendments Act ("ADAAA") amended the ADA to clarify the criteria for determining whether an individual qualifies as disabled. Congress's purpose undergirding the ADAAA was to "reinstat[e] a broad scope of protection to be available under the ADA" and to reject the "inappropriately high" standards for interpreting the term "substantially limits" created by two Supreme Court decisions: *Sutton v. United Air Lines*, 527 U.S. 471 (1999) and *Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184 (2002). *Taylor v. Specialty Restaurants Corp.*, No. 2:12-cv-44, 2014 U.S. Dist. LEXIS 139643, at *9 (S.D. Ohio Sept. 30, 2014) (quoting ADA Amendments Act of 2008, Pub. L. 110-325, 122. Stat. 3553, § 2 (2008)). Congress specifically rejected *Toyota's* holding that the terms "substantially" and "major" should be "interpreted strictly to create a demanding standard for qualifying as disabled." *Id.* at 9–10.

15

With respect to the "substantially limits a major life activity" prong, the ADAAA clarifies that "[t]he determination of whether an impairment substantially limits a major life activity shall be made without regard to the ameliorative effects of mitigating measures" such as medication. 42 U.S.C. § 12102(4)(E). The ADAAA expands the definition of "major life activities" to include: caring for oneself, performing manual tasks, seeing, hearing, eating sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working. 42 U.S.C. § 12102(2)(A)-(B). "Reading is a major life activity under the existing precedent of this circuit and the amended ADA." *Jenkins v. Nat'l Bd. of Med. Examiners*, No. 08-5371, 2009 U.S. App. LEXIS 2660, at *7 (6th Cir. Feb. 11, 2009) (citing *Gonzales*, 225 F.3d at 626; 42 U.S.C. § 12102(2)(A) (2006) (amended 2009)). The implementing regulations to the ADAAA also state that whether an impairment "substantially limits" a major life activity should not demand extensive analysis and requires an individualized assessment. 29 C.F.R. § 1630.2(j)(1)(iii)-(iv).

But not every impairment constitutes a disability under the ADAAA—that is, to qualify as a disability, the impairment must substantially limit "the ability of an individual to perform a major life activity as compared to most people in the general population." 29 C.F.R. § 1630.2(j)(1)(ii); *see also Bibber v. Nat'l Bd. of Osteopathic Med. Exam'r, Inc.*, No. CV 15-4987, 2016 U.S. Dist. LEXIS 48181, at *18 (E.D. Pa. Apr. 11, 2016) ("It is inappropriate under the ADA to compare an individual to her academic peer group or, in the case of standardized tests, to other test-takers who are not representative of the general population.").

The Court's review of whether a plaintiff is disabled under the ADAAA "usually will not require scientific, medical, or statistical analysis," 29 C.F.R. § 1630.2(j)(1)(v), but when

consideration of such evidence is appropriate, the Department of Justice has offered pertinent guidelines. As the Eastern District of Pennsylvania explained:

> The DOJ heavily favors an individualized assessment or evidence that a "qualified professional has individually and personally evaluated the candidate as opposed to simply considering scores from a review of documents." 28 C.F.R. part 36, Appx. A. It also states that this need for an individualized evaluation is "particularly important in the learning disabilities context, where proper diagnosis requires face-to-face evaluation," and that "[r]eports from experts who have personal familiarity with the candidate should take precedence over those from, for example, reviewers for testing agencies, who have never personally met the candidate . . . ."

*Bibber*, 2016 U.S. Dist. LEXIS 48181, at *19. Along with individualized assessments, courts across the country have also considered: "(1) a plaintiff's objective test results as compared to the average person, (2) a plaintiff's other activities, including extracurriculars, (3) whether a plaintiff has a pattern of substantial academic difficulties, and (4) whether a plaintiff has been afforded testing accommodations in the past." *Berger*, 2019 U.S. Dist. LEXIS 145666, at *59 (citing *Healy v. Nat'l Bd. of Osteopathic Med. Examiners, Inc.*, 870 F. Supp. 2d 607, 620 (S.D. Ind. 2012)). The regulations also provide that covered entities should give "considerable weight to documentation of past modifications, accommodations, or auxiliary aids or services received in similar testing situations." 28 C.F.R. § 36.309(b)(1)(v).

AAMC has certainly presented some evidence suggesting that Plaintiff's cognitive abilities are, at a minimum, average when compared to the general population. AAMC's outside reviewers all agree that Plaintiff did not show evidence of substantial limitations when compared to the general population.[1] Beginning with Dr. Harrison, she reviewed Dr. Benninger's evaluation of

---

[1] The Court is mindful of the Department of Justice's guidance that "[r]eports from experts who have personal familiarity with the candidate should take precedence over those from, for example, reviewers for testing agencies, who have never personally met the candidate . . . ." 28 C.F.R. part 36, Appx. A. But the reports Plaintiff has provided are not the *only* pieces of evidence the Court must consider. As stated by the Colorado District Court in a case presenting similar facts:

> Mr. Wright . . . argues that the 'ADA effectively mandates that the Board provide accommodations based on the recommendations from professionals, such as Dr. Lucero, who has provided two first-

Plaintiff and concluded that he failed to demonstrate that Plaintiff is "substantially impaired in her ability to participate equally on the MCAT." (Ex. N to Bugbee Decl., ECF No. 12-1.) Dr. Harrison explained that Dr. Benninger's conclusions were of minimal value because he relied on "self-reported symptoms of ADHD and Executive Functioning (the BRIEF) and on relatively lower (but still average) scores on a few unrelated subtests." (*Id.*) In reviewing Plaintiff's test results from her evaluation with Dr. Benninger, Dr. Harrison noted that Plaintiff fell within the average range on "Digit Recall," the "memory for sentences subtest of the SB5," the passage comprehension subtest of the WJ-IV, and the GORT. (*Id.*)

Dr. Bernier, like Dr. Harrison, similarly concluded that "[t]here is no evidence that the candidate has been an impaired learner as compared to the general population." (Ex. O to Bugbee Decl., ECF No. 12-1.) Dr. Bernier challenged Dr. Benninger's conclusions in large part because he determined the extent of Plaintiff's impaired functioning "based on the internal referent of the candidate herself rather than the external referent of the general population."[2] (*Id.*) Notwithstanding Dr. Benninger's focus on comparing Plaintiff's strengths to her weaknesses

---

hand in-person evaluations of Mr. Wright . . . .' It would certainly make courts' jobs easier if that were the case. But a professional evaluation is not the only piece of evidence a court should consider under the ADA. A diagnosis alone does not satisfy the ADA disability standard . . . . Nor does Mr. Wright provide precedent that a diagnosis evaluation alone qualifies an individual as disabled under the ADA. In fact, courts have frequently denied motions for preliminary injunctions where the plaintiff had a professional evaluation and diagnosis.

*Wright v. Nat'l Bd. of Med. Examiners*, No. 21-cv-02319, 2021 U.S. Dist. LEXIS 211275, at *20 (D. Colo. Oct. 15, 2021). The Court agrees with Plaintiff that due weight should be given to Dr. Benninger, Dr. Costlow, and Ms. Campbell's individualized evaluations. But these evaluations are not the only factors the Court must consider in resolving whether Plaintiff's conditions substantially limit her in comparison to the population at large.

[2] The Southern District of Indiana succinctly explained this critique:

In other words, a person may exhibit statistically significant variation in test scores sufficient to support a clinical diagnosis, but this diagnosis is based on an internal referent. When the test scores are compared to an external referent as the ADA requires — that is, the general population — that person may nevertheless exhibit average abilities.

*Healy v. Nat'l Bd. of Osteopathic Med. Examiners*, 870 F. Supp. 2d 607, 620 (S.D. Ind. 2012).

(rather than comparing Plaintiff's functioning to the general population), Plaintiff's performance on the cognitive tests of working memory were "within one standard deviation of the mean-average compared to others of the same age." (*Id.*) As for the reading tests administered, the WJ-IV and the GORT, Plaintiff was still "average" as compared to the general population. (*Id.*)

AAMC's third outside reviewer, Dr. Greenberg, echoed Dr. Harrison and Dr. Bernier's conclusions, noting also that Dr. Benninger's evaluation provided only "weak support for the presence of substantial functional limitation." (Ex. B to Greenberg Decl., ECF No. 26-2.) Dr. Greenberg also observed that Dr. Benninger evaluated Plaintiff via a series of tests that have "limited applicability" to the MCAT, and the battery that Dr. Benninger did administer was "heavily over-weighted on [Plaintiff's] self-report and the reports of her parents on symptom questionnaires[.]" (Greenberg Decl. ¶¶ 13, 15, ECF No. 26-2.)

Also cutting against Plaintiff's claims are her past performances—without accommodations—on other standardized tests. Plaintiff took both the ACT and the SAT twice, scoring well above average on each exam. On the ACT, her composite scores placed her in the 89th and 94th percentiles—that is, she scored in the top 11% and 6% of students who took the ACT exam in 2018. (*See* Ex. M to Bugbee Decl., ECF No. 12-1.) Her best subject scores were in the 99th percentile (English and Math) and her lowest subject score was in reading, where she placed in the 54th percentile (*i.e.*, the top 46% of test takers). (*Id.*) Plaintiff scored even better on the SAT. (*See* Ex. D to French Decl., ECF No. 26-3.) Her best SAT score was 1500, which placed her in the top 2% of examinees. (*Id.*; *see also* AAMC's Supp. Brief at 7, ECF No. 27.) Plaintiff also took nine AP exams while in high school, earning the highest possible score on four of them.[3]

---

[3] AP Exams are scored on a scale of 1 to 5, with many U.S. colleges granting college credit for scores of 3 and above. *See About AP Scores*, COLLEGE BOARD, https://apstudents.collegeboard.org/about-ap-scores (last visited June 10, 2023). Of Plaintiff's nine AP exams, she received a score of 5 on four of her exams, a score of 4 on one exam, and a score of 3 on the other four exams. (Ex. E to French Decl., ECF No. 26-3.)

(Ex. E to French Decl., ECF No. 26-3.) Plaintiff did not request accommodations on any of these exams, despite reportedly having been provided extra testing time in high school. Thus, Plaintiff's "confidence in taking those exams without even attempting to receive accommodations speaks volumes about whether her [cognitive disorders are] substantially limiting when compared to high achieving groups of people, let alone the general population." *See Bibber*, 2016 U.S. Dist. LEXIS 48181, at *26.

Finally, Plaintiff's academic history demonstrates an unwavering pattern of academic success. Over the course of her high school career, Plaintiff earned all A's in her classes (other than a single B+ in AP English & Composition). (Bugbee Decl. ¶ 17, ECF No. 12-1.) Impressively, Plaintiff achieved this academic success while also playing "three varsity sports, lacrosse, basketball, and soccer," and participating in other extracurricular activities. (Ex. I to French Decl., ECF No. 26-3.) And her success continued at Duke University, where—without any accommodations—Plaintiff achieved straight A's in both semesters of her first year and in the fall semester of her second year. (Ex. G to Bugbee Decl., ECF No. 12-1.)

But the record also contains substantial evidence favorable to Plaintiff. Plaintiff's treating physician, Dr. Benninger, explicitly stated that Plaintiff "has severe problems when compared with the general population with functional impairments including concentrating on tasks, forgetting what she's doing in the middle of things, sustaining her attention, forgetting instructions easily, remembering things even for a few minutes (such as what she reads) and doing more than one thing at a time." (Ex. 4 to Benninger Decl., ECF No. 19.) Indeed, during his evaluation of Plaintiff, her results on the Comprehension Score of the GORT put her in the bottom 25% of achievement levels. (*Id.*) Plaintiff's pediatrician, Dr. Costlow, also recognized a need for Plaintiff to have extended time when taking the MCAT due to her anxiety. (Costlow Decl. ¶¶ 6-7, ECF No. 20-1.)

She, too, concluded that Plaintiff's impairment "substantially limits her ability to read, retain what she reads and concentrate as compared to most people in the general public." (Costlow Decl. ¶ 6, ECF No. 20-1.) And Ms. Campbell, a physician's assistant, also recommended Plaintiff be permitted to take the MCAT with extra testing time following her evaluation of Plaintiff. (Ex. C to Bugbee Decl., ECF No. 12-1.)

Plaintiff also has a history of receiving accommodations. Her sworn declaration states that her high school provided her with "formal and informal accommodations," including "extra time to take tests." (Pl. Decl. ¶ 4, ECF No. 19-1.) Plaintiff also received formal accommodations at Duke University, beginning in the spring of her sophomore year. (Ex. G to Bugbee Decl., ECF No. 12-1.) And in Plaintiff's personal statement submitted to AAMC, Plaintiff detailed her lifelong struggles to process and retain information in academic settings. (*See* Ex. B to Bugbee Decl., ECF No. 12-1.)

Finally, and of particular importance to the issue of whether Plaintiff's has a disability, AAMC's outside experts all endorsed *some* accommodations for Plaintiff—accommodations that AAMC granted pursuant to its policy of providing testing accommodations "when the examinee demonstrates that he or she is disabled within the meaning of the ADA and needs accommodations to take the examination in an accessible manner." (Bugbee Decl. ¶ 10, ECF No. 12-1.) Dr. Harrison noted that Plaintiff's conditions "may require her to take stop-the-clock breaks"; Dr. Bernier concluded that stop-the-clock breaks and a low-distraction test setting appeared to be "appropriate modifications"; and Dr. Greenberg stated that "granting [Plaintiff] 25% extended time (along with the previously approved break time and separate room) is a reasonable course of action and ensures that she will be able to test in an accessible manner." (Ex. N to Bugbee Decl., ECF No. 12-1; Ex. O to Bugbee Decl., ECF No. 12-1; Greenberg Decl. ¶ 17, ECF No. 26-2.) This is not a case where

dueling sets of experts are diametrically opposed on the issue of the presence of a disability—that is to say, *every* expert shares the opinion that *some* accommodations for Plaintiff are appropriate due to her conditions. The battleground, instead, takes place on the *extent* of the testing accommodations to which Plaintiff is entitled. Thus, the uniformity of opinion among Plaintiff's treating physicians and AAMC's outside reviewers that Plaintiff's conditions warrant some accommodations, coupled with AAMC's decision to permit Plaintiff to test with accommodations (an implicit admission by AAMC that Plaintiff is disabled), strongly suggests that Plaintiff is disabled within the meaning of the ADA.

Against this backdrop, the Court admittedly has some reservations about whether Plaintiff is disabled within the meaning of the ADA. While the record includes evidence that Plaintiff has an impairment, to be disabled under the ADA, Plaintiff must show that her impairment results in a *substantial limitation* as compared to the *general population*. The evidence currently before the Court cuts in both directions. But the Court remains cognizant of the "broad scope of protection . . . available under the ADA," *see Taylor*, 2014 U.S. Dist. LEXIS 139643, at *9, and therefore assumes—*without deciding*—that Plaintiff has marshalled sufficient evidence to carry her burden on the issue of whether she is disabled within the meaning of the ADA.

### b. Reasonable Accommodation

Assuming Plaintiff is disabled within the meaning of the ADA, Plaintiff must also show that her request for accommodation is reasonable to prevail on her ADA claim. *Berger*, 2019 U.S. Dist. LEXIS 145666, at *55. She has failed to make this showing.

A person who is disabled under the ADA is not entitled to "the *best* accommodations or [her] *preferred* accommodations, but only to a reasonable accommodation." *Knox County, Tenn. v. M.Q.*, 62 F.4th 978, 1001 (6th Cir. 2023) (citing *Alexander v. Choate*, 469 U.S. 287, 300 (1985));

*see also Oser v. Capital Univ. Law School*, No. 2:09-cv-709, 2009 U.S. Dist. LEXIS 86425, at *23–24 (S.D. Ohio Sep. 8, 2009) (denying preliminary injunction where plaintiff had been provided some additional testing time but not as much as his professional recommended); *In re Reasonable Testing Accommodations of LaFleur*, 722 N.W.2d 559 (S.D. 2006) (holding that the South Dakota Board of Bar Examiners did not violate the ADA by approving half as much extra testing time on the state bar exam than the examinee requested and his supporting professional recommended, where the Board's independent external reviewer recommended less extra time than requested).

The Court concludes that Plaintiff has failed to put forth sufficient evidence on this issue to justify the extraordinary remedy of a preliminary injunction. AAMC has already provided Plaintiff with three accommodations: 25% extended testing time, stop-the-clock breaks, and testing in a separate room. As indicated by AAMC's outside reviewers, these accommodations address Plaintiff's core functional limitations, thus permitting Plaintiff to take the MCAT in an accessible manner. (*See* Ex. B to Harrison Decl., ECF No. 26-1 (recommended accommodations would allow Plaintiff to "refresh her attentional resources, manage her anxiety and hyperactivity, and employ learned strategies to cope with negative cognitions"); Ex. B to Greenberg Decl., ECF No. 26-2 (opining that (1) 125% testing time addresses the "combined effects of anxiety and reading inefficiency leading to mild levels of functional impairment," (2) the stop-the-clock breaks "afford her the opportunity to manage her stress level if she experiences a flare up of anxiety during testing," and (3) testing in a separate room "will help screen her from ambient distractions and from becoming focused on other test-takers' activities").)

Plaintiff's position to the contrary is unavailing. She contends that she cannot be reasonably accommodated unless AAMC grants her 50% extra time on the MCAT, citing to the opinions of Dr. Costlow and Dr. Benninger. (Reply at 11-12, ECF No. 21; Pl. Supp. at 4, ECF No. 25.)

The Court has already discussed a number of concerns it has with Dr. Benninger's reports, and these concerns continue to limit the extent to which the Court defers to his conclusions. *See supra* Section III.A.a. Moreover, Dr. Benninger provides little more than a conclusory statement when recommending 50% extra testing time rather than 25% extra time. (*Compare* Benninger Decl. ¶ 3, ECF No. 24 *with* Ex. B to Harrison Decl., ECF No. 26-1 (stating that "research has failed to support the need for extra test-taking time to compensate for symptoms of ADHD," explaining that "[e]ven college students with well-documented reading impairments require only 25% extra time in order to have equal access to timed tests") *and* Greenberg Decl. ¶ 16, ECF No. 26-2 (describing 25% extra testing time as "often the most appropriate level of accommodation in mild cases of ADHD and . . . in medical conditions that can potentially interfere with concentration," noting also that in "empirical demonstrations . . . the majority of students who are provided higher levels of extended time don't actually utilize it, and that 25% extended time can be effective in normalizing the test taking performance of individuals with ADHD").) As for Dr. Costlow, she only concludes that Plaintiff needs an unspecified "extra time" accommodation—not an accommodation for *50%* extra testing time. (Costlow Decl. ¶ 9, ECF No. 20-1.)

On the record before the Court, the Court cannot say that Plaintiff has a strong likelihood of showing that her requested accommodation is reasonable in light of the testing accommodations that AAMC has already approved—accommodations that specifically address the MCAT-related limitations arising from Plaintiff's conditions. That is, the Court finds little evidence in the record indicating that AAMC's alternative accommodations are unreasonable accommodations for

Plaintiff's disability. The Court therefore finds that Plaintiff has failed to meet her burden of establishing a strong likelihood of success on the merits.

Lastly, although the inability to show a likelihood of success on the merits, standing alone, is enough to deny Plaintiff's Motion, Plaintiff has also failed to demonstrate that the other preliminary injunction factors weigh in favor of her requested relief.

## B. Irreparable Harm

Even if Plaintiff had shown a strong likelihood of success on the merits, to obtain the preliminary relief she seeks, she would also need to demonstrate that "irreparable injury is *likely* in the absence of an injunction." *Winter v. NRDC, Inc.*, 555 U.S. 7, 22 (2008). Irreparable harm must be "actual and imminent" rather than "speculative or unsubstantiated." *Abney v. Amgen, Inc.*, 443 F.3d 540, 552 (6th Cir. 2006).

Plaintiff contends that if she takes the MCAT without the extra time accommodation, she "will be at a severe disadvantage compared to other candidates because she will not have extra time as needed due to her disability," thus negatively impacting "her chances of being accepted into a medical school or the medical school of her choosing."[4] (Reply at 14, ECF No. 21.) Plaintiff, however, has not provided the Court with any evidence suggesting that the current accommodations in place are so inadequate that her future admission into medical school of her choice is at risk. While this Court has concluded that lost educational opportunities and the inability to pursue a vocation are sufficient to establish irreparable injury, scant evidence exists here suggesting such an injury is likely in the absence of a preliminary injunction. *See Berger*, 2019

---

[4] Plaintiff's briefing also asserts that the absence of injunctive relief would cause irreparable harm by delaying when she would be able to take the MCAT, thus reducing her odds of getting into her preferred medical school while exacerbating her cognitive disorders. (Reply at 13-14, ECF No. 21.) As the Court understands this argument, the irreparable harm stems from the delay—and ensuing consequences—in not being able to take the MCAT in June. Since Plaintiff's filing, however, she has confirmed with the Court that she will sit for the June MCAT regardless of the Court's decision on her motion for preliminary injunction, thus ensuring she will not be delayed in applying to medical school, and therefore mooting her contention that such delay amounts to irreparable harm.

U.S. Dist. LEXIS 145666, at *78–80; *Sellers v. Univ. of Rio Grande*, 838 F. Supp. 2d 677, 687 (S.D. Ohio 2012).

As Plaintiff notes in her briefing, when weighing an applicant's application to medical school, MCAT scores and grades receive the "Highest Importance Ratings." (Reply at 15, ECF No. 21 (citing *Using MCAT Data in 2023 Medical Student Selection*, AAMC, https://www.aamc.org/system/files/2022-06/2023%20MCAT%20Data%20Selection%20Guide %20Online.pdf (last visited June 12, 2023)).) The relative weight of these metrics will likely benefit Plaintiff—that is, her grades are unequivocally exceptional, and her track record on standardized exams is impressive as well. Consequently, Plaintiff's blanket assertion that, she may not get into the medical school of her choosing, or even any school at all, without 50% extra testing time (when she has already been approved for 25% extra time), is both "unsubstantiated" and "speculative." *See Abney*, 443 F.3d at 552; *see also Bach v. Law Sch. Adm. Council*, 2014 U.S. Dist. LEXIS 124632, *5–6 (M.D.N.C. Feb. 14, 2014) (denying preliminary injunction; describing plaintiff's argument regarding his likely test results if he tested without accommodations to be speculative, as he had successfully taken other standardized tests without accommodations).

Moreover, even if the Court were to agree that Plaintiff would suffer irreparable harm in the absence of injunctive relief, injunctive relief is not warranted on this basis alone because the Court has already found that Plaintiff has not shown a strong likelihood of success on the merits of her claims. *See Gonzales*, 225 F.3d at 625.

### C.  Balance of the Harms

In assessing the third factor relevant to granting a preliminary injunction, "courts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter*, 555 U.S. at 24 (citation omitted).

Here, the balance of equities also weighs against injunctive relief. Plaintiff, operating under the belief that she is disabled within the meaning of the ADA, contends that "no individual or entity will suffer substantial harm" should the Court grant her Motion. (Mot. at 6, ECF No. 4; Reply at 15, ECF No. 21.) As discussed in Section III.A.b, *supra*, the Court has serious doubts as to whether Plaintiff's request for 50% extra time is reasonable. Given these doubts, the award of potentially unfair accommodations on the June MCAT before a merits determination will affect the comparable validity of the scores of other examinees. Such an award would not only harm other medical school applicants who tested without an equivalent benefit, but it would also compromise AAMC's interest in ensuring that the MCAT is administered fairly to all examinees.

**D. The Public Interest**

Lastly, "[i]n exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter*, 555 U.S. at 24 (quoting *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982)).

Here, Plaintiff has not shown that the public interest weighs in her favor. The public certainly has an interest in ensuring that covered entities provide adequate accommodations to those with disabilities, as required under the law. *See Rush v. National Bd. of Medical Examiners*, 268 F. Supp. 2d 673, 679 (N.D. Tex. 2003) ("[F]ulfilling the ADA's requirement that entities offering licensing examinations provide reasonable accommodations to disabled individuals" furthers the public interest); *Sellers*, 838 F. Supp. 2d at 688 ("'there is a significant public interest in eliminating discrimination against individuals with disabilities' and . . . this interest is furthered

by appropriate injunctive relief") (internal citation omitted). However, the public also has an interest in the faithful administration of the ADA. *See Valles v. ACT, Inc.*, No. 4:22-CV-00568, 2022 U.S. Dist. LEXIS 125769, *15 (E.D. Tex. July 15, 2022) (finding that public has interest "in ensuring that the ADA is enforced according to its requirements"). The public likewise has an interest in the fair administration of the MCAT. *See Wright*, 2021 U.S. Dist. LEXIS 211275, at *27 (finding the potential harm to "other test takers, and the public—which depends on the fair administration of medical-licensing requirements—outweighs the potential harm" of erroneously denying a preliminary injunction); *Bach*, 2014 U.S. Dist. LEXIS 124632, at *8 (noting that "the fair administration of standardized tests" furthers the public interest).

Because Plaintiff has failed to demonstrate that she is likely to succeed in showing that AAMC wrongfully denied her accommodations under the ADA, the Court cannot find that granting the requested relief would serve the public interest. Plaintiff is not entitled to a preliminary injunction.

## IV.    CONCLUSION

After balancing the preliminary injunction factors, the Court concludes that they weigh against granting relief—that is, because Plaintiff has failed to show a strong likelihood of success on the merits, coupled with an inadequate showing as to the remaining preliminary injunction factors, Plaintiff's Motion is hereby **DENIED**. (ECF No. 4.)

**IT IS SO ORDERED.**

**6/20/2023**                                    **s/Edmund A. Sargus, Jr.**
**DATE**                                             **EDMUND A. SARGUS, JR.**
**UNITED STATES DISTRICT JUDGE**

28